# United States Court of Appeals for the Federal Circuit

04-5100,-5102

ZOLTEK CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Dean A. Monco, Wood, Phillips, Katz, Clark & Mortimer, of Chicago, Illinois, argued for plaintiff-cross appellant. With him on the brief was John S. Mortimer. Of counsel on the brief were James F. Davis and Pamela S. Kane, Howrey, Simon, Arnold & White, of Washington, DC.

Anne Murphy, Attorney, Appellate Staff, Civil Division, United States Department of Justice, of Washington, DC. With her on the brief were Peter D. Keisler, Assistant Attorney General, Scott R. McIntosh, Attorney, and Gary L. Hausken, Attorney.

Appealed from: United States Court of Federal Claims

Chief Judge Edward J. Damich

# United States Court of Appeals for the Federal Circuit

04-5100, -5102

ZOLTEK CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED:  March 31, 2006

_____

Before GAJARSA, Circuit Judge, PLAGER, Senior Circuit Judge, and DYK, Circuit Judge.

PER CURIAM.   Concurring opinion filed by Circuit Judge GAJARSA.   Separate concurring opinion filed by Circuit Judge DYK.  Dissenting opinion filed by Senior Circuit Judge PLAGER.

The United States appeals the order of the Court of Federal Claims holding that it could assert jurisdiction over Zoltek Corporation's ("Zoltek")'s patent infringement allegations by treating the action as a Fifth Amendment taking under the Tucker Act. Zoltek cross-appeals the trial court's ruling that 28 U.S.C. § 1498(c) bars this action as arising in a foreign country.  The Court of Federal Claims certified the rulings under 28 U.S.C.  § 1292(d)(2), and this court accepted jurisdiction.  See Zoltek Corp v. United

<u>States</u>, No. 96-166 C (Fed. Cl. Feb. 20, 2004) (certification); <u>see generally</u> <u>Zoltek Corp.</u>

<u>v. United States</u>, 58 Fed. Cl. 688 (2003), <u>Zoltek Corp. v. United States</u>, 51 Fed. Cl. 829

(2002).

We conclude that under § 1498, the United States is liable for the use of a

method patent only when it practices every step of the claimed method in the United

States. The court therefore affirms the trial court's conclusion that § 1498 bars Zoltek's

claims. However, we reverse the trial court's determination that it had jurisdiction under

the Tucker Act based on a violation of the Fifth Amendment.

I.

Zoltek Corporation ("Zoltek") is the assignee of United States Reissue Patent No.

34,162 (reissued Jan. 19, 1993) to a "Controlled Surface Electrical Resistance Carbon

Fiber Sheet Product" ("the Re '162 patent"). The Re '162 patent claims certain methods

of manufacturing carbon fiber sheets with controlled surface electrical resistivity.[1]

Independent claim 1 is representative. After reissue, it reads:

1. A method of manufacturing a plurality of different value controlled resistivity carbon fiber sheet products employing a carbonizable fiber starting material; said method comprising

selectively partially carbonizing previously oxidized and stabilized fiber starting material

for a predetermined time period in an oxygen free atmosphere within a furnace at selected temperature values within a temperature range from 370 degrees Centigrade to about 1300 degrees Centigrade

by soaking the stabilized fiber starting material at the selected temperature for the predetermined period of time

---

[1] Although the Re '162 patent also includes various product-by-process and product claims, only the method claims are at issue here. In a March 5, 2001 motion for leave to file a first amended complaint, Zoltek abandoned its allegations that the government had infringed the product claims. <u>See</u> <u>Zoltek</u>, 58 Fed. Cl. at 689 n.3.

04-5100, -5102

to provide a preselected known volume electrical resistivity to the partially carbonized fibers corresponding to that volume electrical resistivity value required to provide the preselected desired surface resistance value for the finished sheet products,

and thereafter processing the partially carbonized fibers into homogeneous carbon fiber sheet products having the preselected desired surface electrical resistances.

Re '162 patent, col. 8, ll. 42-66.

The method thus takes a "carbonizable fiber starting material" and requires "partially carbonizing" it. "Carbonization" as used in the Re '162 patent means "a process which involves heat treatment in an inert atmosphere which eliminates or removes all elements other than carbon." Zoltek, 48 Fed. Cl. 290, 293 (2000). "Partial carbonization" refers to carbonization sufficient to achieve a desired surface resistance in a sheet woven from the resulting fibers. Id. at 295.

Independent claim 11 describes a representative method for making such fibers and weaving them into a fiber sheet. After reissue, it reads:

11. A method of manufacturing a plurality of different value controlled resistivity carbon fiber sheet products employing carbonizable, previously oxidized and stabilized fiber starting material; said method comprising

forming an oxidized and stabilized tow, stretching and breaking the stabilized tow,

forming the stabilized stretched and broken fiber filaments into sliver comprised of,

large bundles of discontinuous filaments in an untwisted condition,

converting the sliver into roving, spinning the roving into a spun yarn, plying or twisting the spun yarn, weaving or knitting the plied and twisted spun yarn into fabric,

and selectively partially carbonizing the fabric thus formed at preselected elevated temperature values for a predetermined time period in an oxygen

04-5100, -5102

- 3 -

free atmosphere within a furnace having a continuously increasing temperature profile within the range from about 370 degrees Centigrade to about 1300 degrees Centigrade to provide a known preselected electrical volume resistivity to the partially carbonized fiber filament in the fabric corresponding to that value of electrical volume resistivity required to provide the preselected desired surface resistance for the finished fabric.

Re '162 patent, col. 9, l. 65 – col. 10, l. 24.

Independent claim 15 describes a method for making and processing the fibers into paper-like sheet products. Id. at col. 10, l. 35 – col. 11, l. 8. In short, the steps of the claimed methods are directed to "partially carbonizing" fibers, and weaving or processing them into controlled resistivity carbon fiber mats or sheets.

The relevant facts are undisputed. The United States contracted with Lockheed Martin Corporation ("Lockheed") to design and build the F-22 fighter. Zoltek, 51 Fed. Cl. at 831. Lockheed subcontracted for two types of silicide fiber products that it uses in the aircraft. The first is a pre-impregnated material made from Nicalon silicon carbide fibers. These fibers are partially carbonized and manufactured into sheets in Japan, which are then imported into the United States. The second is a silicide fiber mat made from Tyranno fibers. The Tyranno fibers are manufactured exclusively in Japan, but they are processed into mats in the United States. Zoltek, 58 Fed. Cl. at 690.

Zoltek brought suit in the Court of Federal Claims under § 1498(a), alleging that the United States and Lockheed used the methods claimed in the Re '162 patent when Lockheed's subcontractors made the two silicide fiber products used in the F-22. Zoltek alleges that the mats and sheets were made, for the United States, using the claimed methods.

The government moved for partial summary judgment that Zoltek's § 1498(a) claims were barred by § 1498(c) because they arose in Japan. The trial court denied

04-5100, -5102

- 4 -

the motion. Although it agreed that § 1498(c) barred Zoltek's claims under § 1498(a), the trial court directed Zoltek to amend its complaint to allege a taking under the Fifth Amendment. Id. at 707. The trial court concluded that Zoltek could assert the infringement claims under 28 U.S.C. § 1491(a)(1) as a taking in violation of the Fifth Amendment. Id. at 690-91 & 695-706. The trial court certified its § 1498 analysis and its holding that Zoltek's patent infringement claims sounded in the Fifth Amendment, under § 1292(d)(2). Both parties timely sought permission to appeal. This court accepted the interlocutory appeals and has jurisdiction under 28 U.S.C. §§ 1292(c)(1) and 1295(a)(3).

The issues before the court are purely questions of law. This court reviews the trial court's statutory and constitutional analysis without deference. See Shoshone Indian Tribe of Wind River Reservation v. United States, 364 F.3d 1339, 1345 (Fed. Cir. 2004).

## II.

The federal government is immune from any legal action by its sovereign immunity. See United States v. Sherwood, 312 U.S. 584, 586 (1941) (stating that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued"). The waiver of immunity can be limited and conditioned by the Congress. See United States v. Nordic Village Inc., 503 U.S. 30, 34 (1992) (stating that the government's consent to be sued must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires). A patentee's judicial recourse against the federal

government, or its contractors, for patent infringement, is set forth and limited by the terms of 28 U.S.C. § 1498.[2]  Section 1498(a) provides, in pertinent part:

> Whenever an invention described in and covered by a patent of the United States <u>is used</u> . . . <u>by or for the United States</u> without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

<u>Id.</u> (emphasis added).

This court has held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." <u>NTP, Inc. v. Research in Motion, Ltd.</u>, 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing <u>Motorola, Inc. v. United States</u>, 729 F.2d 765, 768 n.3 (Fed. Cir. 1984)).  We have further held that "a process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country." <u>Id.</u> at 1318.  Consequently, where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a).  We affirm the trial court's conclusion that § 1498(a) bars Zoltek's claims.

---

[2]        As the Supreme Court recognized at least as long ago as 1881, the patentee's recourse for infringement by the government is limited by the scope of the waiver of sovereign immunity established by the Congressional consent to be sued.  "If the jurisdiction of the Court of Claims should not be finally sustained [to hear an infringement action against the government], the only remedy against the United States, unless Congress enlarges the jurisdiction of that court, would be to apply to Congress itself." <u>James v. Campbell</u>, 104 U.S. 356, 359 (1881).  In short, the power to limit a Congressional abuse of sovereign immunity lies in the political process rather than the judicial branch.

04-5100, -5102

III.

We turn to the trial court's takings analysis. The Court of Federal Claims held that Zoltek could bring its action against the government under the Tucker Act, by alleging that the infringement was a taking of private property for public use under the Fifth Amendment. See Zoltek, 58 Fed. Cl. at 707. We reverse.

In Schillinger v. United States, 155 U.S. 163 (1894), the Supreme Court rejected an argument that a patentee could sue the government for patent infringement as a Fifth Amendment taking under the Tucker Act. Id. at 169. Schillinger remains the law.

The trial court determined that the Supreme Court "effectively overruled Schillinger sub silentio" in Crozier v. Fried. Krupp Aktiengesellschaft, 224 U.S. 290 (1912). Zoltek, 58 Fed. Cl. at 702. We disagree. The Court of Federal Claims, like this court, is bound by Schillinger, and the trial court rulings to the contrary are not viable.

Crozier involved Army weapons manufacture. Fried. Krupp was a German corporation holding patents relating to improvements in guns and gun carriages. William Crozier was the Army Chief of Ordnance and directed the manufacture of field guns and carriages for the Army. In 1907, Fried. Krupp sued Crozier in the supreme court of the District of Columbia. The company alleged that the Army's weapons manufacture was infringing Fried. Krupp patents. Although the complaint originally sought preliminary and permanent injunction, and an accounting, the company later dropped the prayer for preliminary injunction and waived the prayer for accounting. Crozier, 224 U.S. at 297-99. Crozier demurred, arguing that the real party in interest was the United States, and that the trial court lacked jurisdiction. Id. at 300. The trial

court sustained the demurrer and dismissed.  Id.  In 1908, the Court of Appeals reversed.  Id.

Before the Supreme Court heard argument, Congress enacted the Patent Act of 1910.  See Pub. L. No. 61-305, 36 Stat. 851 (1910) (later codified as amended at § 1498).  When it eventually heard the case, the Supreme Court reversed and remanded with instructions to dismiss so that the company could refile and proceed in the Court of Claims under the 1910 Act.  Crozier, 224 U.S. at 309.

The contention that Crozier somehow overruled Schillinger, and recognized patent infringement as a Fifth Amendment taking, is flawed.  The only question before the Supreme Court was whether the trial court had jurisdiction to enjoin the government from alleged patent infringement.  Because Congress, in adopting the 1910 Act, precluded injunctive relief against the government for patent infringement, the Crozier court concluded that the trial court lacked the power to grant Fried. Krupp the injunctive relief it was seeking.  Id. at 308.  None of the relevant Schillinger issues were joined: Crozier was not filed in the Court of Claims, had nothing to do with the Tucker Act, did not allege a taking, and was solely in equity.  Moreover, discussing the state of the law before the 1910 Act, the Crozier court expressly noted that no patent infringement action could be brought against the government unless in the Court of Claims under a contract or implied contract theory.  See id. at 304.  Far from "overruling" Schillinger, this acknowledges and endorses the rule that Schillinger established.  The Court thus recognized that by enacting the 1910 Act, Congress "add[ed] the right to sue the United States in the court of claims" for patent infringement.  Id.  If the right already existed

under the Fifth Amendment, as the trial court here suggests, then this analysis in Crozier would be flawed.

Indeed, the Supreme Court repeated this characterization of the 1910 Act just eight years later. See Cramp & Sons Ship & Engine Bldg. Co. v. Int'l Curtis Marine Turbine Co., 246 U.S. 28, 41 (1918) (citing Schillinger and explaining that the 1910 Act "was intended alone to provide for the discrepancy resulting from the right in one case to sue on the implied contract and the non-existence of a right to sue" for infringement). In Crozier and Cramp, the Supreme Court therefore acknowledged Congressional recognition that the Court of Claims lacked Tucker Act jurisdiction over infringement under a takings theory. The legislative history of the 1910 Act confirms that the statute augmented the Court of Claims' Tucker Act jurisdiction by providing jurisdiction over the tort of patent infringement. See H.R. Rep. No. 61-1288 at 3 (1910).

The Court of Federal Claims reasoned that because Crozier discussed the 1910 Act in terms of eminent domain, the Supreme Court must have reconsidered its analysis in Schillinger. This reasoning is misplaced. It is true that Crozier, and several cases applying the 1910 Act (in its original form and as amended and recodified at § 1498), analyze the statute in terms of takings and protecting property rights. Under this case law, patent infringement by the government is analogized to "taking" a "compulsory license." The view is consistent with the text of the 1910 Act, which provided for reasonable compensation for patent infringement, 36 Stat. 851, and with the legislative history, which provided that the purpose of the bill was "to enlarge the jurisdiction of the Court of Claims so that said court may entertain suits against the United States for the infringement or unauthorized use of a patented invention, in certain cases, and award

04-5100, -5102

- 9 -

reasonable compensation to the owner of the patent." H.R. Rep. No. 61-1288, at 1 (1910).

But when interpreting the Constitution "[i]t is emphatically the province and duty of the judicial department to say what the law is." Marbury v. Madison, 5 U.S. 137, 177 (1803). That Congress may adopt a limited waiver of sovereign immunity and confer rights on patentees for money damages against the government, whatever the rationale, cannot disturb the Supreme Court's analysis of the Fifth Amendment in Schillinger. Neither the wording nor rationale of the 1910 Act, nor the Supreme Court's discussion of it in Crozier, affects the rule in Schillinger. Of course, the 1910 Act was not even before the Crozier court, as the action was filed three years before the Act was enacted. Even the plain language of the 1910 Act—entitled "An Act To Provide Additional Protection For Owners of Patents of the United States"—belies the trial court's analysis here, as it legislates against the background of the Schillinger legal framework.

In sum, the trial court's conclusion that Crozier "effectively overruled Schillinger sub silentio" has no merit. The trial court's remaining conjectures on takings jurisprudence do not require consideration. We simply note that to reach its conclusion the Court of Federal Claims had to read an entire statute, § 1498, out of existence—a result that betrays the error in the trial court's analysis. As the Supreme Court has clearly recognized when considering Fifth Amendment taking allegations, "property interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Ruckelshaus v. Monsanto Co., 467 U.S. 986,

1001 (1984) (citations omitted).[3]  Here, the patent rights are a creature of federal law. In response to Schillinger, Congress provided a specific sovereign immunity waiver for a patentee to recover for infringement by the government.  Had Congress intended to clarify the dimensions of the patent rights as property interests under the Fifth Amendment, there would have been no need for the new and limited sovereign immunity waiver.  The manner in which Congress responded to Schillinger is significant. "The life of the law has not been logic; it has been experience."[4]  Neither the Court of Federal Claims nor this court can ignore the path of the patent law as it has evolved under § 1498.

The dissent argues that we are wrong to conclude that Schillinger remains good law.  Both inverse condemnation claims and regulatory takings claims, it asserts, are currently viewed as claims founded upon the Fifth Amendment of the Constitution for purposes of the Tucker Act, and these claims are not barred for having arisen in tort.  If, as the dissent argues is suggested by Crozier, a patent is a type of property that comes within the ambit of Fifth Amendment Takings Clause protection, why should we not likewise permit claims for patent infringement to arise under the Tucker Act?

The answer is simple.  Unlike regulatory takings and the inverse condemnation of real property, the "taking" of a license to use a patent creates a cause of action under § 1498.  The dissent fails to appreciate that this destroys whatever force its argument by

---

[3]     In Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1003-04 (1984), the Court concluded that government interference with interests "cognizable as trade-secret property right[s]" could constitute a taking depending on the circumstances.  But Monsanto did not overrule Schillinger, and we must follow Schillinger until it is overruled by the Supreme Court, whether or not Schillinger is viewed as inconsistent with Monsanto.  See Indep. Ink, Inc. v. Ill. Tool Works, Inc., 396 F.3d 1342, 1351 (Fed. Cir. 2005), cert. granted, 1215 S. Ct 2937 (2005).

[4]     Oliver W. Holmes, The Common Law 5 (M. Howe ed. 1963) (1881).

04-5100, -5102

- 11 -

analogy may otherwise have had. Indeed, if we were to interpret § 1491 as the dissent would have us, it would render superfluous § 1498—the remedy that Congress fashioned specifically to compensate patentees for the use of their patents by the federal government. Moreover, even if we shared the dissent's belief that the Supreme Court would overrule Schillinger, we are nevertheless bound by its holding. It is not our place to overrule sub silentio the Supreme Court. See Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). In sum, the trial court erred in finding that Zoltek could allege patent infringement as a Fifth Amendment taking under the Tucker Act, and we reverse.

IV.

For the reasons set forth herein, we affirm the trial court's conclusion that the infringement allegations at bar are precluded by § 1498(a). We reverse the trial court's ruling that Zoltek can allege patent infringement as a Fifth Amendment taking under the Tucker Act. We remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

Each side will bear its own costs.

04-5100, -5102

- 12 -

# United States Court of Appeals for the Federal Circuit

04-5100, -5102

ZOLTEK CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

GAJARSA, <u>Circuit Judge</u>, concurring.

I agree that we are bound by our panel decision in <u>NTP, Inc. v. Research in Motion, Ltd.</u>, in which we held that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." 418 F.3d 1282, 1316 (Fed. Cir. 2005) (citing <u>Motorola, Inc. v. United States</u>, 729 F.2d 765, 768 n.3 (Fed. Cir. 1984)). However, the <u>NTP</u> proposition is, in my view, the result of an unchecked propagation of error in our case law, and its viability may eventually be challenged. Consequently, I write separately to emphasize that our decision today does not depend for its validity on <u>NTP</u>, as it is also supported by an independent line of reasoning.

I.

Before discussing this additional basis for today's decision, I shall briefly address the ignoble history of the <u>NTP</u> proposition. An examination of the case law reveals that the proposition has its roots in <u>Decca v. United States</u>, in which we held that the United

States could be liable under 28 U.S.C. § 1498 only for direct infringement and not for indirect infringement:

> Section 1498 expressly waives the Government's sovereign immunity only with respect to governmental direct infringement of a patent. Nowhere in the section is active inducement of infringement or contributory infringement mentioned, either directly or by cross-reference to 35 U.S.C. §§ 271(b) and (c). A waiver of sovereign immunity must be strictly construed. Stated differently, the Government is not to be regarded as having waived its sovereign immunity by implication.

225 Ct. Cl. 326, 340 (Ct. Cl. 1980). Thus, after <u>Decca</u>, a patentee who sought to establish a § 1498(a) claim had to prove "direct" infringement by the United States. I have no problem with this formulation of the rule, as it was the product of the <u>Decca</u> court's thoughtful analysis.

It is important to note, however, the relationship between the phrases "direct infringement," as used in <u>Decca</u>, <u>id.</u>, and the phrase "direct infringement under § 271(a)" as used in <u>NTP</u>, 418 F.3d at 1316. That relationship is one of set to subset: infringement under 35 U.S.C. § 271(a) is a specific kind of "direct infringement." Thus, while "direct infringement" is one of the requirements of an action against a private party under § 271(a), it is not the only requirement, with § 271(a) also requiring, <u>inter alia</u>, that the infringing activity occur "within the United States."

<u>Decca</u>, of course, did not require that a § 1498(a) plaintiff satisfy all of the requirements of § 271(a). Indeed, <u>Decca</u> did not even mention § 271(a). Instead, it required only that the accused use constitute a direct, rather than an indirect, infringement. <u>NTP</u>, in contrast, states as a blanket proposition that all of the requirements of 35 U.S.C. § 271(a) must be satisfied in order to prove a 28 U.S.C. § 1498 claim against the government. See <u>NTP</u>, 418 F.3d at 1316.

04-5100, -5102

- 2 -

How did such a sweeping generalization evolve from <u>Decca</u>?  The answer, unfortunately, is that its evolution owes to this court's imprecise recharaterization of the <u>Decca</u> holding in our decision in <u>Motorola</u>.  <u>See</u> 729 F.2d 765, 768 n.3.  In <u>Motorola</u>, this court cited <u>Decca</u> at the end of a footnote as one of a number of cases supporting the very general proposition that the patent statutes are often inapplicable to actions arising under section 1498.  <u>Id.</u>  It stated that "the Government can only be sued for any direct infringement of a patent (35 U.S.C. § 271(a)), and not for inducing infringement by another (section 271(b)) or for contributory infringement (section 271(c))."  <u>Id.</u> (emphasis added) (citing <u>Decca</u>, 640 F.2d at 1167).

By equating the specific statutory provision "35 U.S.C. § 271(a)" with the more general concept of "direct infringement," the <u>Motorola</u> court carelessly extended the <u>Decca</u> holding, thus laying the groundwork for the <u>NTP</u> proposition.  There is distinct irony in the <u>Motorola</u> court's being responsible for the creation of an inadvertent link between 35 U.S.C. § 271(a) and 28 U.S.C. § 1498(a), given that the entire point of the <u>Motorola</u> footnote was to support the proposition that it is erroneous to simply assume the existence of relationships between these two statutory sections.  <u>See id.</u> at 768 (explaining that "[a]lthough a section 1498 action may be similar to a Title 35 action, it is nonetheless only parallel and not identical").

Although in <u>Motorola</u> the relationship between sections 271(a) and 1498(a) constituted mere dicta, in <u>NTP</u> the relationship, as slightly recast, became the binding precedent of this court.  In my view, such a sweeping rule of binding precedent ought not to be created by mere inadvertence.  In turn, the resolution of the important issue

04-5100, -5102

- 3 -

before this court today—the scope of the government's waiver of sovereign immunity as embodied in § 1498—ought not to be based solely on the basis of NTP.

In his concurring opinion, Judge Dyk attempts to find support for the NTP proposition. Citing certain legislative materials which state that the sole purpose of enacting § 1498(a) was to create jurisdiction (rather than additional liability), he argues that § 1498(a), even when viewed apart from 1498(c), cannot result in "the government's liability [being] broader than that of private parties." Id. In other words, according to his concurrence the limits of government liability under § 1498(a) are circumscribed by the hypothetical liability of a private actor under § 271(a), and we can entirely ignore § 1498(c) in the analysis.

His reliance on legislative history is misplaced, however, given that the plain language of the text demands a contrary and unambiguous interpretation. As is explained below, the plain language of the statute reveals that 28 U.S.C. § 1498 is not a mere waiver of sovereign immunity with respect to the previously-existing remedy, which was provided by 35 U.S.C. § 281 for transgressions denominated by § 271 as "infringing" the exclusionary rights granted by § 154(a).

There can be little doubt that § 1498 is more than a mere waiver of sovereign immunity. The plain language of the statute speaks of the provision of a "remedy," and the fourth paragraph of subsection (a) indicates that "remedy" means "right of action." See id. ("[This section shall not convey a right of action on any patentee . . . with respect to any invention discovered . . . while in the employment . . . of the United States . . . .") (emphasis added). Section 1498 is by no means a mere jurisdictional statute, and to the extent that materials in the legislative history may appear to suggest otherwise, they

serve principally to illustrate why courts should often view legislative history with skepticism and rely on it only when the statute itself is ambiguous. If the NTP proposition can be sustained, it cannot be sustained on this ground.

Granted, in creating a new remedy, § 1498(a) inherently creates new rights. However, there is nothing about the text of § 1498(a) that either suggests or requires the existence of any substantive or conceptual link between these rights and remedies and those provided by the patent laws (pursuant to 35 U.S.C. §§ 154(a) and 281, respectively). The independence of these two sets of rights and remedies results from § 1498(a) conditioning the availability of a remedy (and the inherent creation of a corresponding right) only on the "invention [being] described in and covered by a patent" (emphasis added) and the invention's being "used or manufactured by or for the United States without license of the owner thereof or lawful right . . . ." (emphasis added). The "coverage" provided by a patent is, of course, defined by the scope of its claims. See, e.g., Johnson & Johnston Assocs. v. R.E. Serv. Co., 285 F.3d 1046, 1052 (Fed. Cir. 2002) (expounding on the "fundamental principle that claims define the scope of patent protection"); see also Sri Int'l v. Matsushita Elec. Corp., 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("It is the claims that measure the invention." (citing Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc., 365 U.S. 336, 339 (1961))). Accordingly, a § 1498 right and remedy exist whenever an accused embodiment, used or manufactured by or for the government, falls within the scope of the patent claims as

04-5100, -5102

properly construed.[1]  The "coverage" inquiry is independent of the nature and identity of the Title 35 rights that might have been available against a private infringer under the same circumstances.

Indeed, prior to the passage of § 1498(c), the remedy created by § 1498(a) was broader than that available against private parties in some instances.  Again, the plain text of subsection (a) makes this clear.  Whereas § 271(a) contains a territoriality restriction, § 1498(a) contains none.  Indeed, if § 1498(a) had not created a cause of action against the government that was broader, with respect to overseas infringement, than that available against a private infringer, then it is difficult to understand the purpose of § 1498(c)—a subsection specifically barring § 1498 claims that "aris[e] in a foreign country."

In summary, patentees have the following rights and remedies: (1) a 35 U.S.C. § 281/271 remedy (for which neither 28 U.S.C. § 1498(a) nor any other statute provides a waiver of sovereign immunity) for transgression of rights granted by 35 U.S.C. § 154, and (2) a 28 U.S.C. § 1498 remedy (assertable against the federal government) for transgressions of an inherently-defined right to be compensated for government manufacture or use of inventions covered by patents.  Because § 1498(a) created new and independent rights and remedies, rather than merely waiving sovereign immunity

---

[1]     In a § 1498 case, determining the scope of the claims proceeds via the same two-step analysis that occurs in a § 271(a) action, namely claim construction, followed by a determination of whether the claims—as construed—read on the accused device.  See Lemelson v. United States, 752 F.2d 1538, 1548 (Fed. Cir. 1985) ("Although this court has noted that a section 1498 action and a title 35 action are only parallel and not identical, the principles of claim construction and reading claims on accused devices and methods are the same for either type of action.") (citations omitted).  Of course, the rights triggered when embodiments fall within the claims may differ under § 1498 and § 271.

04-5100, -5102

with respect to an old remedy (i.e. § 281), one cannot argue that § 1498(a) a priori requires § 271(a) as an underlying and predicate cause of action.

In fact, not even NTP posited a relationship specifically between § 271(a) and § 1498, subsection (a). Rather the articulated relationship—the so-called "NTP proposition"—is between § 271(a) and § 1498 as a whole. See NTP, 418 F.3d at 1316 (holding that "direct infringement under section 271(a) is a necessary predicate for government liability under section 1498"). Not even NTP requires us to ignore the importance of § 1498, subsection (c), as Judge Dyk urges us to do in his concurrence.

I should explain that the per curiam opinion—which I join—does indeed state that the government's "liability does not exist pursuant to § 1498(a)" and that "1498(a) bars Zoltek's claims." (emphasis added). However, this usage simply reflects the fact that subsection (a) creates the cause of action. Consequently, liability—if not precluded by subsection (c)—must arise pursuant to subsection (a). The court's opinion today in no way endorses the view that subsection (c) is irrelevant, although we clearly do acknowledge the precedential effect of the NTP proposition, as articulated by the NTP court.

Judge Dyk's concurrence advances a second argument in support of the NTP proposition, namely that § 1498(a) was intended to be the "exact equivalent" of § 271(a), citing for support Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 343 (1927). A careful reading of that case reveals, however, that the Court made no such pronouncement. Richmond Screw was a case about the assignability of patent claims. The backdrop was Rev. Stat. § 3477, which forbade inter alia the assignment of patent infringement claims against the United States that had not been reduced to

04-5100, -5102

judgment. Thus, under § 1498(a), as it existed prior to amendment in 1918, when a government <u>contractor</u> infringed a patent, the patent owner had both an assignable right of action against the contractor under § 271(a) and a claim against the government pursuant to § 1498(a), with the latter being non-assignable pursuant to Rev. Stat. § 3477.

The 1918 amendments to § 1498 eliminated the remedy against the contractor pursuant to § 271(a), confining the patentee to a suit against the government for his entire compensation. <u>See</u> Pub. L. No. 65-182, 40 Stat. 704, 705 (1918). The salient question was what would become of <u>assigned</u> claims against the contractor. Did Rev. Stat. § 3477, which barred the assignment of claims against the United States, prevent the assignee of a § 271(a) claim against a government <u>contractor</u> from pursuing a 1498(a) claim against the government pursuant to the 1918 Amendment? Troubled by the possibility of the 1918 Act effecting an uncompensated taking under the Fifth Amendment, the Court held that § 3477 did not apply "to the assignment of a claim against the United States which is created by the Act of 1918 in so far as the Act deprives the owner of the patent of a remedy against the infringing private contractor for infringements thereof and makes the Government indemnitor for its . . . infringements." <u>Richmond Screw</u>, 275 U.S. at 346.

Contrary to Judge Dyk's reading, the Court did not assert a blanket proposition that § 1498(a) must be viewed as being coextensive in all respects with § 271(a). It is true that the Court said, as quoted in his concurrence, that "[w]e must presume that Congress in the passage of the Act of 1918 intended to secure to the owner of the patent the <u>exact equivalent</u> of <u>what it was taking away</u> from him." (emphasis added).

04-5100, -5102

- 8 -

The concurring opinion appears to assume—incorrectly—that "what it is taking away" refers to § 271(a) as a whole, leading Judge Dyk to conclude that the Act of 1918 (constituting § 1498, as amended) is "the exact equivalent" of § 271(a). However, the Court tells us what it was referring to by the words "what it was taking away," and it was not referring to § 271(a) rights globally. Rather, it was referring—narrowly—to the assignability of rights pursuant to § 271(a). The next two sentences of the quoted passage, which the concurrence omits, make this point clear.

> We must presume that Congress in the passage of the Act of 1918 intended to secure to the owner of the patent the exact equivalent of what it was taking away from him. It was taking away his assignable claims against the contractor for the latter's infringement of his patent. The assignability of such claims was an important element in their value and a matter to be taken into account in providing for their just equivalent.

Id. at 345 (emphasis added). In its careful—and restrictive—analysis the Supreme Court actually declined the opportunity to articulate a broad, sweeping relation between § 271(a) and § 1498.

The NTP court should not have articulated such a relationship, especially not through reliance on logically flawed dicta, and I can see neither the need nor the clear basis for us—at least in this case—to attempt to support through logic, post hoc, what the NTP court has wrought through folly. Perhaps the NTP proposition will in the future gain recognition as a useful expedient against the backdrop of a more thoroughly interpreted § 1498. For now, however, I view the proposition as being no more than an inadvertent leap of faith from the specific to the general. Accordingly, while I join the court's opinion—recognizing that NTP binds us—my confidence that we are reaching the just and logical outcome stems not from it, but from the following analysis.

04-5100, -5102

- 9 -

II.

I believe that this case poses two substantial questions of statutory interpretation. First, when is a patented method "used" under § 1498(a)? Second, does an infringement action "arise[ ] in a foreign country" under § 1498(c) if some steps of a claimed method are practiced abroad?

I conclude that a party "uses" a method claim within § 1498(a) only when it practices every step of the claimed method. Furthermore, an action for an infringing use of a patented method "arises in a foreign country" under § 1498(c) whenever any claimed step is practiced abroad. I would therefore have affirmed the trial court's conclusion that § 1498 bars Zoltek's claims, even if we were not compelled to recognize NTP as precedent.

Section 1498 provides, in relevant part:

Whenever an invention described in and covered by a patent of the United States is used . . . by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . . For the purposes of this section, the use . . . of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use . . . for the United States.

28 U.S.C. § 1498(a) (2000) (emphases added). At § 1498(c), Congress further limited the scope of claims under § 1498(a) with a foreign country exception. That limitation provides:

The provisions of this section shall not apply to any claim arising in a foreign country.

28 U.S.C. § 1498(c) (2000).

04-5100, -5102

- 10 -

Both sections require interpretation. First, the court must determine the meaning of a "use," as applied to a method claim, in § 1498(a). Second, the court must determine when a claim "arises" in a foreign country under § 1498(c). The trial court complicated this analysis by collapsing the two steps together.[2] Although the two sections must be construed in harmony to preserve the integrity of the statutory scheme, in the first instance the questions of "use" and "arising" are separable. I address each issue in turn.

A.

The court's statutory analysis must give effect to Congress's intent when enacting the statute. See Nat'l Labor Relations Bd. v. Lion Oil Co., 352 U.S. 282, 297 (1957) (observing that the court bears "a judicial responsibility to find that interpretation which can most fairly be said to be embedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested"); Doyon, Ltd. v. United States, 214 F.3d 1309, 1314 (Fed. Cir. 2000). The analysis begins with the text of the statute. Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997); White v. Dep't of Justice, 328 F.3d 1361, 1374 (Fed. Cir. 2003). To fully understand the meaning of a statute, however, the court looks "not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." Crandon v. United States, 494 U.S. 152, 158 (1990); accord Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 478 (1997).

---

[2] The Court of Federal Claims ultimately concluded that § 1498(c) precluded any claim for a "use" of a patented process unless every step of the claimed process took place "within the United States." Zoltek, 51 Fed. Cl. at 836.

04-5100, -5102

In this case the text of § 1498(a) is silent on the test for "use" of a patented method. The specific problem is a question of degree. In particular, one must decide whether "use" means practicing some steps of a claimed method, or instead requires practicing every claimed step.

At the outset I note that it is well-settled, as a matter of patent law, that an infringing use of a patented method requires practicing every step claimed in the method.[3] See Smith & Nephew, Inc. v. Ethicon, Inc., 276 F.3d 1304, 1311 (Fed. Cir. 2001) ("Infringement arises when all of the steps of a claimed method are performed[.]"); see also NTP, 418 F.3d at 1318 ("[A] process cannot be used 'within' the United States as required by section 271(a) unless each of the steps is performed within this country.");[4] accord Deepsouth Packing Co., Inc. v. Laitram Corp., 406 U.S. 518, 528 (1972) ("[A] combination patent [asserted under § 271(a)] protects only against the operable assembly of the whole and not the manufacture of its parts."). The rule applies the long-settled principle, more commonly phrased in terms of products and the elements of device claims, that infringement requires practicing each and every limitation of the asserted patent claim. See V-Formation, Inc. v. Benetton Group SpA, 401 F.3d 1307, 1312 (Fed. Cir. 2005) (recognizing the black-letter law that an accused product infringes a patent claim only if each and every limitation in the claim appears in the accused product); Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 796

---

[3] See 35 U.S.C. § 271(a)(2000) ("Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.").

[4] Although NTP merges the question of conduct (the use) and location (within the United States) in this explanation of § 271(a), the court plainly adopts the proposition that an infringing use requires practicing every step of a claimed method.

04-5100, -5102

(Fed. Cir. 1990) ("To establish infringement of a patent, every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent."). "[A]ll [specified elements in a patent claim] must be regarded as material, leaving open only the question whether an omitted part is supplied by an equivalent device or instrumentality." William W. Hubbell v. United States, 179 U.S. 77, 82 (1900). Nothing in the text of § 1498 warrants a contrary interpretation of an infringing use here. Indeed, the result is consistent with the narrow reading that a court must assign § 1498.

Because § 1498(a) waives sovereign immunity for infringement actions against the government, a court must give the statute a strict construction. See Lane v. Pena, 518 U.S. 187, 192 (1996); United States v. Sherwood, 312 U.S. 584, 590 (1941) (citing Schillinger v. United States, 155 U.S. 163 (1894)); Shoshone Indian Tribe v. United States, 364 F.3d 1339, 1346 (Fed. Cir. 2004); RHI Holdings, Inc. v. United States, 142 F.3d 1459, 1461 (Fed. Cir. 1998). The waiver "must be unequivocally expressed in statutory text" and the courts will not imply exceptions. Lane, 518 U.S. at 192 (citing United States v. Nordic Village, Inc., 503 U.S. 30, 33-34, 37 (1992) and Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95 (1990)). Consistent with these principles a court must resolve any ambiguity in the statute "in favor of immunity." See United States v. Williams, 514 U.S. 527, 531 (1995). Applying these principles to § 1498(a) makes the narrowest interpretation of an infringing "use" presumptively correct. Because I must narrowly construe the breadth of the statutory language, the sovereign immunity analysis confirms that the "use" of a claimed method under § 1498(a) requires practicing every step in the claim.

04-5100, -5102

- 13 -

Assuming Zoltek alleges an infringing use, the question becomes where the § 1498(a) claim arises.  Under § 1498(c), Congress curtailed its sovereign immunity waiver to preclude § 1498(a) claims "arising in a foreign country."  The question here is the extent of this curtailment when the government practices a patented process having multiple steps.

In addressing this question, it is useful to imagine four factual scenarios.  The first and easiest scenario is where all of the steps of the process were performed in this country—a situation in which there is no question that a claim, if any, must arise in the United States.  The second scenario is where all of the steps were performed abroad, as is true in this case with the alleged infringement of the Nicalon fiber claims.  (I address these claims in the next section.)  Later in the opinion, I will address the meaning of 1498(c) in the context of the third and fourth scenarios, in which some, but not all steps were performed abroad; in the third scenario, the last step of the process is practiced abroad, and in the fourth scenario (as with the Tyranno fiber claims), the last step is practiced in the United States.

1.

I shall start with the Nicalon fiber claims, in which all of the infringing steps were performed abroad.  Clearly the infringing activity is entirely outside the United States from a geographical perspective.  Therefore, it does not occur "within" the United States as required by § 271(a), as the law has long recognized that patent infringement claims arise where the infringing activity is consummated.  See, e.g., Deepsouth, 406 U.S. at 527 (holding that final assembly abroad of a patented device cannot be an infringing

manufacture within the meaning of § 271(a)). But this is not a § 271(a) action, and there is therefore no a priori reason why this court must interpret the "arising in a foreign country" language of § 1498(c) as being antonymous with the phrase "within the United States," as used in § 271(a). However, based on a review of the legislative history and a broad construction of § 1498(c)—a construction necessary to limit the scope of Congress' waiver of sovereign immunity under § 1498(a)—I would hold that § 1498(c) precludes at a minimum those actions premised on infringing activity in which all steps of the infringing process are performed abroad.

Congress enacted § 1498(c) in 1960 as part of its amendments providing an action against the government for copyright infringement. See Pub. L. No. 86-726, 74 Stat. 855 (1960). While Congress considered various drafts, the State Department suggested the language eventually codified at § 1498(c).[5] The discussion accompanying the suggestion indicates that the Department specifically intended the language of subsection (c) to remedy concerns that the proposed bill would allow suit for actions abroad, by the United States, which infringed copyrights. See H. Rep. No. 86-624, at 6-7 (1959) (reprinting June 5, 1958 letter from William B. Macomber, Jr., Assistant Secretary of State, to James O. Eastland, Chairman of the Senate Judiciary Committee). Recognizing that the patent provisions of § 1498(a) had the same ambiguity "with respect to infringements occurring abroad," the State Department suggested making the foreign country exception applicable to both patent and copyright infringement. Id. at 7. The Commerce Department agreed that there was ambiguity

---

[5] The State Department comments were directed to H.R. 8419, a predecessor bill to H.R. 4059. H.R. 4059 was enacted on September 8, 1960. See Pub. L. No. 86-726, 74 Stat. 855 (1960) (codified at 28 U.S.C. § 1498).

04-5100, -5102

- 15 -

concerning "an act of infringement in a foreign country," and endorsed the State Department suggestion. See id. at 5-6 (reprinting Feb. 27, 1959 letter from Frederick H. Mueller, Under Secretary of Commerce, to Emanuel Celler, Chairman of the House Judiciary Committee). The foreign country exception at § 1498(c) adopts the State Department suggestion without change. See Pub. L. No. 86-726, 74 Stat. 855 (1960) (codified in relevant part at § 1498(c)). In short, the legislative history confirms that Congress intended §1498(c) to foreclose actions on § 1498(a) violations taking place in, or arising in, a foreign country.

In construing statutory language, it is prudent to be cognizant of constructions that courts have accorded to identical language, where it occurs in other statutes. Here I recognize that Congress took the language of § 1498(c) from identical language found at 28 U.S.C. § 2680(k), adopted twelve years earlier.[6] Normally, where Congress borrows language from one statute in enacting another, the meaning accorded terms in the source statute can be taken as probative of the meaning in the borrowing statute. See Lorillard v. Pons, 434 U.S. 575, 580-81 (1978); id. at 581 ("[W]here . . . Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute[.]").

---

[6] The Federal Tort Claims Act ("FTCA") waives sovereign immunity for certain tort claims against the United States. See 28 U.S.C. § 1346(b). The statute contains a foreign country exception that precludes § 1346(b) liability for "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k). Congress enacted this provision in 1948. See 62 Stat. 984, 985 (1948). Twelve years later, Congress used the same language when enacting § 1498(c). See Pub. L. No. 86-726, 74 Stat. 855 (1960) (codified at § 1498(c)).

04-5100, -5102

Plainly, many determinants of the borrowed statute canon are satisfied here. The statutes serve similar purposes. Both provisions limit the potential government liability occurring abroad by curtailing Congress's sovereign immunity waiver for tort liability. Moreover, during Senate sub-committee hearings, the testimony made clear that § 1498(c) was intended to provide an exclusion analogous to § 2680(k).[7] In this case, however, the meaning of § 2680(k) has limited value for interpreting § 1498(c). This is true because the borrowed statute canon is not absolute, and it does not justify results either inconsistent with the statutory scheme at bar, or leading to functional absurdity in application. Consequently, for the reasons given below, I conclude that the borrowed statute canon does not compel us to interpret §1498(c) in light of § 2680(k).

In Sosa v. Alvarez-Machain, 124 S. Ct. 2739 (2004), the Supreme Court held that a "claim arising in a foreign country," under § 2680(k), referred to where tortious injury is suffered. "[T]he FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." Id. at 2754. A patent infringement claim, however, is different in kind from the tortious injuries contemplated by § 2680(k).

Though patent infringement claims may be viewed as species of tort claims, they are subject to a territoriality restriction unknown in general tort law. Determining the

---

[7] See Infringement of Copyrights: Hearings on H.R. 4059 Before the Senate Subcommittee On Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 86th Cong. 12-13 (1960) (statement of Arthur Fisher, U.S. Registrant of Copyrights) ("[I]t was originally felt that [§ 1498(c)] was unnecessary, that a tort committed abroad would not be subject to suit under the act. . . . [I]t is quite clear that whatever is the situation with respect to infringements committed abroad, this act leaves the situation in status quo; it does not affect it. [§ 1498(c)] simply says that this [section] shall not apply to torts committed abroad[.] . . . [O]ther agencies have not felt safe in operating under the Government Tort Claims Act, and . . . we should simply follow along with a substantially parallel position to the patent law.").

04-5100, -5102

liabilities of the United States for patent infringement under 28 U.S.C. § 1498(a) requires the application of only United States law, because section 1498 conditions the government's liability on the existence of patent rights granted by the United States. In contrast, the FTCA requires application of local law to determine the liability of the United States, and under governing choice of law principles, the local law to be applied is typically the law of the place where the injury occurred. 28 U.S.C. § 1346(b)(1) (2000).

Allowing recovery for foreign injury where the causative acts occurred in the United States thus raised the specter that the liability of the United States would be governed by foreign law. No similar problem exists under the patent laws because United States law will apply to the infringing acts occurring in the United States. Under these circumstances, construing the "arising in" language of section 1498(c) to look to the place of the infringing act rather than the place of the injury is perfectly consistent with the Congressional objectives.[8]

Although Zoltek urges the court to read § 1498(c) as limited to claims arising under foreign patent laws, neither Zoltek's suggestion nor the Supreme Court's rationale in <u>Sosa</u> sensibly applies here. First, § 1498(a) plainly provides for actions concerning "invention[s] described in and covered by a patent of the United States[.]" 28 U.S.C.

---

[8] Our cases concerning personal jurisdiction in patent cases, which look to "the location . . . at which the infringing activity directly impacts on the interests of the patentee," <u>Beverly Hills Fan Co. v. Sovereign Corp</u>., 21 F.3d 1558, 1571 (Fed. Cir. 1994), address where suit may be brought to enforce an existing substantive claim, but those cases do not define the substantive claim itself. The question of whether a patent infringement claim can be maintained at all (controlled by sections 1498(a) and 1498(c) where the alleged infringer is the government) is analytically distinct from the personal jurisdiction issue. Any uncertainty as to the scope of the patent law must be determined before addressing personal jurisdiction over the claim.

04-5100, -5102
- 18 -

§ 1498(a).  Zoltek's analysis would read this provision, in view of § 1498(c), as waiving sovereign immunity to allow infringement actions under a foreign patent if the asserted claim coincided with protections under an issued U.S. patent.  I find that reading stylized and unpersuasive.  If Congress intended to allow suit against the government for infringing a foreign patent, it would have so stated, and not limited the possible actions by reference to parallel U.S. patents.  Moreover, Zoltek's suggestion is inconsistent with the plain language of § 1498(c) and the structure of § 1498.  It would make little sense for Congress to curtail the sovereign immunity waiver at § 1498(c) if the underlying action in § 1498(a) allowed suit "under foreign law."  In short, § 1498 is consistent with a provision to vindicate a U.S. patent right, not a foreign patent right.  Second, for similar reasons, unlike § 2680(k), § 1498(a) does not require a choice of law analysis and the Sosa consideration of place of injury is simply inapplicable here.  In sum, the § 1498(a) claim arises where the infringing activity is consummated.

This analysis precludes Zoltek's Nicalon fiber allegations.  Where all the steps of a process patent are performed abroad, the claim "arises in a foreign country," and the action is barred by § 1498(c).  The record evidences that the accused Nicalon fiber products were made entirely in Japan.  Zoltek's contention that the government violated § 1498(a) when Lockheed's Japanese subcontractors "used" Zoltek's method claims to make the Nicalon products, therefore, fits squarely within our interpretation of § 1498(c).  The same holds for the Tyranno fiber allegations, insofar as the fibers were made in Japan.  The Court of Federal Claims correctly determined that it lacked jurisdiction to decide those allegations.

04-5100, -5102

2.

The infringement allegations concerning the Tyranno fiber products, however, cannot be tethered to any single location. This presents the difficult question. Although the fibers were made overseas, the record shows that the final products were made in the United States. According to Zoltek's infringement allegations, some of the claimed method steps were practiced in Japan, and some in the United States. The allegedly infringing conduct, in short, was not confined within national boundaries.

Does such conduct "arise in a foreign country" within the meaning of § 1498(c)? As explained herein I conclude that it does, with the effect of barring Zoltek's Tyranno fiber product allegations. Put differently, I read "claims arising abroad" expansively, as capturing any claim that does not arise entirely through domestic infringing conduct. In doing so, I reject any contention that the analysis depends on where any individual step of the claimed method was practiced.

Two longstanding interpretative principles support the conclusion that the language at § 1498(c), limiting the sovereign immunity waiver at § 1498(a), includes within its proscription the conduct disputed in this action. First, the courts generally disfavor extraterritorial application of United States law. See EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) ("It is a long-standing principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."). The principle rests on sound policy, including a concern to avoid conflict with other national laws, regard for international comity, choice of law analysis, and separation of powers. Thus, in Deepsouth, the Supreme Court expressly refused to extend the scope of § 271(a) to capture an extra-

04-5100, -5102

- 20 -

territorial manufacture of an infringing device absent express guidance from Congress. "Our patent system makes no claim to extraterritorial effect . . . and we correspondingly reject the claims of others to such control over our markets." 406 U.S. at 531 (citing Brown v. Duchesne, 60 U.S. (19 How.) 183, 195 (1856) and Boesch v. Graff, 133 U.S. 697, 703 (1890)). In narrowing the reach of actions under § 1498(a), § 1498(c) manifests a Congressional intent to limit infringement actions where conduct by or for the government sounded abroad. Reading § 1498(c) to foreclose the action at bar is consistent with a strict view of the extra-territoriality principle.[9]

Second, this view comports with the narrow construction that a court must afford sovereign immunity waivers. A court must resolve textual ambiguity in a statutory waiver in favor of immunity. As noted above, the waiver must be clear, and ambiguities resolved in favor of immunity. Since the waiver must be construed narrowly, the § 1498(c) exclusion—serving to narrow the waiver at § 1498(a)—must be construed broadly. Cf. Shoshone Indian, 364 F.3d at 1346. Given an expansive reading, these principles indicate that a claim "arises in a foreign country" under § 1498(c) if, as with the Tyranno product allegations, some steps of a claimed method are practiced abroad.[10]

Although this court has never decided how § 1498(c) applies to transnational conduct in practicing a patented method, on one occasion our predecessor court was

---

[9] The dissent suggests that we have ignored the Fifth Amendment in determining the proper jurisdictional scope provided by § 1498.

[10] While not a basis for my interpretation of § 1498, I note that any rule that allowed sovereign immunity, and liability, to turn on where a defendant practiced any given step of a claimed method would simply invite strategic manipulation and prove unworkable. Potential infringers would simply move their conduct offshore—if only for the last step of the process—in order to avoid the specter of § 1498(a) liability.

04-5100, -5102

confronted with allegations of infringing use of a transnational <u>device</u>. In <u>Decca Ltd. v. United States</u>, 544 F.2d 1070 (Ct. Cl. 1976), as in this case, the government argued that § 1498(c) was a dispositive bar to jurisdiction. The Court of Claims, however, neither expressly interpreted nor applied the statute.[11] Instead, as explained below, it crafted a test for determining an effective "location" of the accused, internationally disposed, device. The <u>Decca</u> court then determined that if such a device could be said to be located "within the United States," the § 1498(a) claim for infringing use would arise where the device was "located." For several reasons I conclude that no comparable test should apply to the facts in this case.

To understand why, it bears reviewing the case in detail. <u>Decca</u> involved the Omega long range radio navigation system. Certain components of the system—broadcast stations—were located overseas. The plaintiff, Decca, owned U.S. Patent No. 2,844,816, which claimed radio navigation systems.[12] It alleged that the Omega system infringed certain device claims in the '816 patent and that the government violated § 1498(a) by using the Omega system. The government sought dismissal, arguing that because some broadcast towers were located in Norway and other overseas locations, the action arose in a foreign country and was barred by § 1498(c).

---

[11] Indeed, although the United States briefed the issue in conjunction with a motion to dismiss, the trial division of the Court of Claims specifically noted in its pretrial order that "[j]urisdiction is not disputed and is hereby determined to be present." <u>Decca</u>, No. 299-70, Pre-Trial Order ¶ 1 (Ct. Cl. Mar. 20, 1975).

[12] The trial court found the government liable for an infringing use of claim 11, which claimed a hyperbolic radio navigation system. <u>See</u> '816 patent, col. 12, l. 63 – col. 13, l. 34 (claim 11); <u>Decca</u>, 544 F.2d at 1083. With minor changes in the factual findings, the three judge panel adopted the trial court's analysis. <u>Decca</u>, 544 F.2d at 1072.

04-5100, -5102

- 22 -

The court disagreed.  The Court of Claims defined the "location" of the Omega system to be "in United States territory," implicitly reasoning that an infringing use "within the United States," a fortiori, does not give rise to an infringement claim "arising in a foreign country" under § 1498(c).  In sum, Decca stands for the narrow, and collateral, proposition that under § 1498(a) the infringing use of a claimed device "arises" where an accused device is "located."

There are, however, no "use of device" claims at issue in this action, and Decca is therefore inapposite.  In Decca, the elements of a patented device were assembled, one by one and in different countries, and the device was therefore made.  Likewise, in this case, the steps of a patented process were practiced, one by one and in different countries, and the process was therefore performed.  However, these cases are not analogous, because the concept of the "use" of a device is fundamentally different from the use of a process.  Whereas utility can be extracted from a device only after it has been "made," utility is extracted from a process concurrent with its being "practiced." See NTP, 418 F.3d at 1318 ("Because a process is nothing more than the sequence of actions of which it is comprised, the use of a process necessarily involves doing or performing each of the steps recited. This is unlike use of a system as a whole, in which the components are used collectively, not individually.").  As a consequence of this failure in the analogy, Decca is neither on point nor particularly instructive.

Consequently, I would decline any invitation to extend Decca's rationale beyond its intended context of device claims to practicing the steps of a claimed method.  In particular, the Decca rationale for characterizing the accused Omega radio navigation system as "located . . . within the United States" threatens to swallow the § 1498(c)

04-5100, -5102

- 23 -

limitation if applied to the process claim at bar. <u>Decca</u>'s infringement analysis placed "particular emphasis on the ownership of the equipment by the United States, the control of the equipment from the United States and on the actual beneficial use of the system within the United States." 544 F.2d at 1083. Relying on these observations, both the trial court and the appellate panel concluded that the "location of the infringement is within United States territory." <u>Id.</u> at 1074. The panel relied, in particular, on the fact that the infringing broadcast equipment "is designed and built by the United States Government," and that the "location of the whole . . . is where the 'master' station or stations are, which is in the United States of America, and where all the stations are monitored, presently in Washington, D.C." <u>Id.</u>

Were a court to extend <u>Decca</u>'s reasoning here, it could conclude that where the government, or a contractor acting at the government's direction, commissions or directs the conduct later accused of infringing a method patent, the resulting claim for infringing use under § 1498(a) "arises" within the United States, and not abroad, under § 1498(c). Applying the <u>Decca</u> reasoning out of its intended context of device claims, however, would effectively read the plain language of § 1498(c) out of existence. The statute concerns allegations of infringement against the government, and it is difficult to imagine circumstances where such conduct would not be traceable back to the federal government, thus completely avoiding the narrowing effect of § 1498(c) on Congress's waiver of sovereign immunity. In short, if the accused conduct is always traceable to decision making in the United States, proximately causing otherwise "infringing" conduct abroad, then such claims will never be restricted by the prohibition at § 1498(c).

04-5100, -5102

- 24 -

III.

In sum, the infringing use of a patented method under § 1498(a) consists of practicing all steps in the claimed method.  Because the injury from infringement is intangible and not amenable to geographical reference, the cause of action cannot be said to arise where injury is suffered, and the § 2680(k) cases are of limited value in interpreting § 1498(c).  I would thus look to where the infringing conduct occurred to ascertain where the claim arises.  In the first analysis, no particular step has primacy.  But since a court must give the sovereign immunity waiver at § 1498 narrow construction, I must view the exclusion at § 1498(c) broadly and resolve ambiguity in favor of immunity.  For that reason, § 1498(c) precludes an action premised on infringing use of a method claim if some steps of the method are practiced abroad.  Since Zoltek's Tyranno product claims falls within this construction, they are barred.  Thus, the trial court properly concluded that it lacked jurisdiction over those infringement allegations.

The dissent argues that I must be careful to construe § 1498 in a manner that does not somehow run afoul of the Fifth Amendment.  Its concern is fundamentally misguided, however, even if one assumes, for sake of argument, that a patent is a type of property to which Fifth Amendment protections apply.  Section 1498 is a waiver of sovereign immunity, the scope of which is completely within the discretion of

04-5100, -5102
- 25 -

Congress.[13]   In fact, there is no Fifth Amendment requirement that § 1498 exist at all; it is the responsibility of Congress, and of Congress alone to decide whether, and to what extent, it will permit the courts to help it fulfill its Constitutional obligations under the Takings Clause.[14]   A court need not concern itself with whether § 1498, construed narrowly in recognition of Congress' sole power to waive sovereign immunity, provides a compensation scheme that is compliant with the requirements of the Takings Clause. It is not our place to interpret sovereign immunity waivers with an eye toward their Takings Clause sufficiency <u>vel non</u>, because the Constitution does not require Congress

---

[13]      <u>See</u> <u>Lynch v. United States</u>, 292 U.S. 571, 582 (1934) ("The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced. . . . [including] those arising from some violation of rights conferred upon the citizen by the Constitution . . . ." (citing <u>Schillinger v. United States</u>, 155 U.S. at 166, 168 ("The United States cannot be sued in their courts without their consent, and in granting such consent Congress has an absolute discretion to specify the cases and contingencies in which the liability of the Government is submitted to the courts for judicial determination.  Beyond the letter of such consent the courts may not go, no matter how beneficial they may deem, or in fact might be, their possession of a larger jurisdiction over the liabilities of the Government."))).

[14]      Indeed, before the passage of the Tucker Act, ch. 359, § 1, 24 Stat. 505 (1887) (codified as amended at 28 U.S.C. § 1491), Congress had sole responsibility for paying takings claims.  No judicial relief was available.  <u>See, e.g.</u>, <u>Langford v. United States</u>,  101 U.S. 341, 343 (1879) (holding that notwithstanding the obligation of the United States to pay just compensation, there existed no remedy in the courts because "Congress has made no provision by any general law for ascertaining and paying this just compensation").   In <u>Lynch v. United States</u>, the Supreme Court reaffirmed the discretion of Congress to reserve to itself the payment of just compensation for Fifth Amendment takings.  292 U.S. 571.  In that case, the Court started by recognizing that "[r]ights against the United States arising out of a contract with it are protected by the Fifth Amendment."  <u>Id.</u> at 579.  It held, however, that Congress may elect to retain the sole power to remediate alleged "takings" of these contractual rights.  <u>See</u> <u>id.</u> at 582 ("When the United States <u>creates rights in individuals against itself</u>, it is under no obligation to provide a remedy through the courts.  It may limit the Individual to administrative remedies.  And withdrawal of all remedy, administrative as well as legal, would not necessarily imply repudiation. So long as the contractual obligation is recognized, <u>Congress may direct its fulfillment without the interposition of either a court or an administrative tribunal</u>." (emphasis added) (citing <u>United States v. Babcock</u>, 250 U.S. 328, 331 (1919) and <u>Tutun v. United States</u>, 270 U.S. 568, 576 (1926))).

04-5100, -5102

to create remedies <u>in the courts</u> at all.  If Congress did not create a statutory scheme for compensation as provided under § 1498, it would follow that without such a provision, compensation would need to be obtained through legislative action.

IV.

For the aforegoing reasons, I believe that there exists an additional, and independent, basis for reaching the decision of the court today that § 1498(a) liability for the use of process claims requires all the steps to have been practiced in the United States.  In my view, therefore, our decision today could have been reached without relying on <u>NTP</u>.

04-5100, -5102

# United States Court of Appeals for the Federal Circuit

04-5100, -5102

ZOLTEK CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

DYK, <u>Circuit Judge</u>, concurring.

I join the court's per curiam opinion but write separately to express my view that the court correctly held in <u>NTP, Inc. v. Research in Motion, Ltd.</u>, 418 F.3d 1282, 1316 (Fed. Cir. 2005), that the government can only be liable for infringement under section 1498(a) if the same conduct would render a private party liable for infringement under section 271(a).[1]

I

Section 1498(a) provides, in pertinent part:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

---

[1] Under 28 U.S.C. § 1292 (d)(2), "the nature and scope of our review are not limited to the certified question but [rather] we are free to consider all questions material to the trial court's order . . . ." <u>United States v. Connolly</u>, 716 F.2d 882, 885 (Fed. Cir. 1983).

In my view, the purpose of section 1498(a) was to make the United States and its contractors liable for "use" of a patented invention that would in similar circumstances constitute direct infringement by a private party.

Patent rights are nothing more than the rights to exclude others. See 35 U.S.C. § 154(a) (2000) (defining the patent grant in terms of its exclusionary powers). In the case of private parties that right is cabined to infringement occurring within the United States. Congress could not have intended to confer broader rights against the United States than against private parties.

The omission of the "within the United States" language (appearing in section 271(a)) from section 1498(a) does not suggest that the government's liability for infringement is broader than that of private parties. Section 271(a) broadly defines the rights of patent holders against all persons who utilize the patented invention; the language of the section is broad enough to cover the United States. Section 271(a) does not, however, waive the government's sovereign immunity. That was the purpose of the original section 1498, which was designed to provide a remedy against the government for the infringement described in section 271(a). In other words, unlike section 271(a), section 1498(a) was not designed to define what constitutes infringement (terminology that does not appear in section 1498(a)). Rather, it was intended to define the "owner's remedy" against the United States, when the United States did not have a license or the "lawful right to use" the patented invention. The question whether the United States had a lawful right to use the invention turned on whether a private party would have had such a right, as the history of section 1498 confirms. The additional purpose of section 1498, as amended in 1918, was to

substitute a remedy against the United States for a remedy against private parties working for the government.

Legislation in 1910 first conferred the right to sue the United States for infringement. Pub. L. No. 61-305, 36 Stat. 851 (1910). That legislation was simply designed to waive the sovereign immunity of the United States for preexisting causes of action conferred by the patent statute (what is now section 271(a)).[2] As the House committee explained, "Our only purpose is to extend the jurisdiction of [the Court of Claims] so that it may entertain suits and award compensation to the owners of patents in cases where the use of the invention by the United States is unauthorized and unlawful . . . ." H.R. Rep. No. 61-1288, at 3 (1910). In considering the 1910 legislation, Congressman Crumpacker stated that the bill "simply gives consent of the Government to these parties to sue in the Court of Claims for this class of liabilities that it would be liable to suit for if it were not for its sovereignty." Congressman Currier, who introduced the bill, agreed, explaining that the bill "does not create any liability; it simply gives a remedy upon an existing liability." 45 Cong. Rec. 8755, 8756 (1910).

The 1918 amendments, Pub. L. No. 65-182, 40 Stat. 704, 705 (1918), similarly confirm that the purpose of the statute was simply to obligate the United States to the same extent as private parties. Congress was concerned that when patented inventions were used or manufactured by others for the United States, suit was being

---

[2] The 1910 enactment provided: "That whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the Court of Claims." Pub. L. No. 61-305, 36 Stat. 851.

brought against government employees or contractors individually. Thus in 1918, Congress changed the language of the 1910 statute to read:

> That whenever an invention described in and covered by a patent of the United States shall hereafter be used <u>or manufactured</u> by <u>or for</u> the United States without license of the owner thereof or lawful right to use <u>or manufacture</u> the same, <u>such owner's remedy shall be by suit against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture</u>.

<u>Id.</u> (emphasis added).

Congress intended the 1918 amendment "to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government, and to limit the owner of the patent . . . to suit against the United States in the Court of Claims for the recovery of his reasonable and entire compensation . . . ."[3] <u>Richmond Screw Anchor Co. v. United States</u>, 275 U.S. 330, 343 (1928). Congress in taking this action could hardly have intended that the substituted rights against the United States would be broader than the original rights against the employee or contractor. Indeed, in construing the 1910 legislation (as amended in 1918) to resolve the question whether infringement claims against the government were assignable, the Supreme Court expressly held that the statute

> is an attempt to take away from a private citizen his lawful claim for damage to his property by another private person which but for this act he would have against the private wrongdoer. . . . We must presume that Congress in the passage of the act of 1918 intended to secure to the owner of the patent the <u>exact equivalent</u> of what it was taking away from him.

---

[3] What is now the second paragraph of section 1498(a), originally part of 35 U.S.C. § 94, was added in 1942 to further clarify that actions against United States employees or contractors were barred and replaced by an action against the United States. <u>See</u> Pub. L. No. 77-768, § 6, 56 Stat. 1013, 1014 (1942); S. Rep. No. 77-1640, at 5 (1942).

Id. at 345 (emphasis added). See also Coakwell v. United States, 372 F.2d 508, 511 (Ct. Cl. 1967) ("[Section 1498] was not intended to change the basic incidents to which liability would attach for the purposes of seeking comprehensive compensation for the unlicensed use of a patented invention.").

The "exact equivalent" of section 271(a) limits liability to infringement occurring "within the United States."[4] Accordingly, the government cannot be responsible for an infringing "use" under section 1498(a) unless the act constitutes a directly infringing "use within the United States" under section 271(a), as Research in Motion correctly held. There is no need to decide the scope of section 1498(c) in this case.

II

Finally, I note that Judge Plager's interesting discourse on takings jurisprudence completely fails to explain how taking of a property right could possibly have occurred here. Patent rights are creatures of federal statute.[5] They do not exist in the abstract. If, as I urge, the patent holder's right to sue the government for infringement under 1498(a) is no broader than the rights of the patent holder against private parties under section 271(a), then there can be no taking resulting from the refusal to recognize a greater right against the government. And if, on the other hand, section 1498 is construed to give the patent holder greater rights against the government than against private parties, that right is necessarily defined by both sections 1498(a) and 1498(c) taken together. It makes no sense to say that section 1498(a) confers rights that are "taken" by section 1498(c). Under these circumstances there can be no taking by the

---

[4] There is no occasion here to determine whether claims for infringement liability under 271(f) and 271(g) may be brought in suits against the government.
[5] Unlike the situation in Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984), we deal here with a property right created by federal law.

04-5100, -5102                             5

government under any interpretation of section 1498, quite apart from the barrier posed by the Supreme Court's decision in <u>Schillinger v. United States</u>, 155 U.S. 163 (1894). There is thus no basis for a Fifth Amendment takings claim in this case even if <u>Schillinger</u> were overruled.

# United States Court of Appeals for the Federal Circuit

04-5100, -5102

ZOLTEK CORPORATION,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

PLAGER, <u>Senior Circuit Judge</u>, dissenting.

There are two separate though related issues in this case, both matters of first impression. One is of major significance to our understanding of the constitutional obligations of the United States ("United States" or "Government"); both relate as well to important rights of patent owners.[1] The first issue is, may an owner of a United States patent bring a cause of action under the Fifth Amendment to the Constitution[2] against the United States for a 'taking' as all other owners of property rights may; or is a patent right somehow less of a property interest, not worthy of such constitutional protection? Until this case, this issue has never been addressed directly by this or any other court.

The second issue, dealing with a cause of action for infringement of a United States patent, is raised in the context of a method or process patent claim involving

---

[1] The term "patent owner" as used throughout this opinion includes assignees of a patent.

[2] "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

multiple steps. When an owner of such a patent sues the United States for infringement under the provisions of 28 U.S.C. § 1498, the statute that authorizes such suits against the Government, does the fact that some or all of the steps are performed in a foreign country preclude recovery? If so, is this because of some inherent limitation in § 1498(a), or is it because of the express statutory exception in § 1498(c) for a claim "arising in a foreign country"? (The relevant statutory language is set out in the footnote below.[3]) This is not only a new question of statutory interpretation, but because of the way the Supreme Court and this court have understood § 1498, there are significant constitutional overtones as well.

## I. Introduction

Plaintiff invented and patented a process for manufacturing a carbon fiber sheet product, a product that is used in making military aircraft with a low radar signature, the so-called 'stealth' aircraft. Defendant, the United States, so plaintiff alleges, caused the use of plaintiff's patented invention in the course of having a new fighter plane, the F22, built, and, according to plaintiff, did it without permission and in violation of plaintiff's rights. For this plaintiff seeks damages.

---

[3]     The relevant portion of 28 U.S.C. § 1498(a) reads:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

Section 1498(c) reads in its entirety: "The provisions of this section shall not apply to any claim arising in a foreign country."

In the trial court, the United States argued that, on the undisputed facts, plaintiff did not have a cause of action against the Government under either the statutes of the United States or under the Constitution. The argument before the trial court, and again on appeal, largely focused on 28 U.S.C. § 1498. That statute grants an owner of a United States patent the right to damages if the patented invention is used or manufactured by or for the United States without license or lawful right, and, if it applies, it is understood that the statute both waives the sovereign's immunity and gives the Court of Federal Claims jurisdiction to hear the cause.

The trial court concluded that, because of the limitations imposed by § 1498(c), plaintiff on the facts of this case could not state a claim for relief for patent infringement, and so granted the Government partial summary judgment on that issue. On the other hand, the trial court concluded that plaintiff does have a cause of action under the Fifth Amendment to the Constitution for a 'taking' of its patent rights by the Government, a cause of action separate and distinct from the infringement claim.[4] The trial court denied the Government summary judgment on that issue. We accepted interlocutory appeal on both rulings.

---

[4] The trial court and the majority opinion both treat the problem of the taking claim as one of establishing jurisdiction in the Court of Federal Claims. This is incorrect, since a well-pleaded complaint establishes jurisdiction; the legal issue is whether plaintiff has stated a claim for which relief can be granted. Further, with regard to the infringement issue, as the trial court explained, the Government's defense under § 1498(c) is an affirmative defense, and the pleadings clearly establish a well-pleaded complaint. Again, a more accurate description of the issue is whether plaintiff has stated a claim for which relief can be granted. See Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999) ("[A] court's general power to adjudicate in specific areas of substantive law . . . is a question of a court's subject matter jurisdiction," whereas "the question of whether in a specific case a court is able to exercise its general power with regard to the facts peculiar to the specific claim . . . is properly addressed as a question of whether the plaintiff has stated a claim upon which relief can be granted.").

Although my panel colleagues cannot agree why, they do agree that (1) an owner of a United States patent can be denied the basic protections of the Constitution, and that (2) if *any one step* of a multi-step patented process occurs outside the United States, the Government is immune from liability under § 1498 for its infringement of the patent. They are wrong on both propositions. I would uphold the trial court's conclusion that the taking claim states a cause of action entitling plaintiff to a full trial of the issue, and reverse the trial court's erroneous conclusion regarding § 1498. Since this is the exact opposite of what my colleagues are ruling, I respectfully dissent.

## II. Overview

As there are three other opinions in this case, I begin by summarizing the problems I have with my colleagues' collective and separate views. First, in their per curiam opinion, my colleagues' analysis of the § 1498 liability issue consists of one brief paragraph that concludes, "where, as here, not all steps of a patented process have been performed in the United States, government liability does not exist pursuant to section 1498(a)." Per curiam op. at 6. They base this conclusion on the erroneous assumption that a cause of action for infringement of a patent by the United States under § 1498 is governed by the limitations of 35 U.S.C. § 271(a), the statute that defines infringement among private litigants, and not by the express terms of 28 U.S.C. § 1498(a), the exclusive statute that defines the Government's liability in similar circumstances.

In his concurring opinion, Judge Gajarsa acknowledges the problem with trying to incorporate the terms of § 271(a) into § 1498(a), but he has been persuaded that we are

04-5100, -5102                                          4

bound by brief language on the subject found in this court's <u>NTP</u> opinion, decided last year, suggesting that incorporation is established law. Though he believes <u>NTP</u> is wrong on this point, Judge Gajarsa nevertheless feels bound. Judge Dyk, on the other hand, in his concurring opinion argues that the comment in <u>NTP</u> is or should be controlling law.

Because of the way the majority in their per curiam opinion resolve the issues in this case, applying the magical incorporation doctrine to § 1498(a), the trial court's decision that plaintiff's infringement claim is barred by the express terms of subsection (c) dealing with causes that "arise in a foreign country"—the issue that was certified to us—is not addressed at all in the per curiam opinion, nor by Judge Dyk in his concurrence. Judge Gajarsa, however, does address it in his concurring opinion, <u>see</u> Gajarsa concurring op. at 14-24, even though, on his view of the statute as stated in the per curiam opinion, subsection (c) has no bearing on the outcome.

Since I do not dispose of plaintiff's infringement claim by rewriting § 1498(a) as the majority chooses to do, I must address the subsection (c) exception. In part IV of this opinion I will explain both why the majority's incorporation assumption has no basis in law, and why the assumed 'binding effect' of the <u>NTP</u> precedent is neither binding nor precedent. I will then explain that, at least with regard to the Tyranno process, the subsection (c) exception does not apply here. And finally I will comment on why the majority's view of the limitations imposed by § 1498 raises significant constitutional concerns.

Second, regarding the takings issue, the per curiam opinion does provide somewhat more analysis, but the analysis is on the wrong subject. According to the per

curiam opinion, the takings issue in this case turns on the meaning of an 1894 Supreme Court case, <u>Schillinger v. United States</u>, 155 U.S. 163 (1894). The meaning of <u>Schillinger</u> is then stated in the opinion in one summary sentence, without reference to the facts of the case or the Supreme Court's actual holding. The remainder of the per curiam takings discussion goes off into a lengthy discourse about why other cases decided some years later did not *sub silentio* overrule <u>Schillinger</u>. Interesting, but irrelevant. The key is <u>Schillinger</u>. As I shall explain next, <u>Schillinger</u> does not stand for what the per curiam opinion tells us it does, and thus the majority's conclusion based on their reading of it is wrong. (The concurrences add little to the takings discussion, but where relevant will be addressed below.)

## III. The Fifth Amendment Taking Issue

The Fifth Amendment to the Constitution provides a series of protections for the individual against governmental abuses, and concludes: "nor shall private property be taken for public use, without just compensation." This provision has a long and noble history of protecting and preserving property rights against unfettered Governmental seizure, and in so doing of protecting individual freedom and personal integrity from undue government authority.[5]

---

[5]  [T]he only dependable foundation of personal liberty is the personal economic security of private property. . . . There is no surer way to give men the courage to be free than to insure them a competence upon which they can rely. Men cannot be made free by laws unless they are in fact free because no man can buy and no man can coerce them. That is why the Englishman's belief that his home is his castle and that the king cannot enter it . . . [is] the very essence of the free man's way of life.

Walter Lippmann, <u>The Method of Freedom</u> 101-02 (1934).

It is well understood that this constitutional provision does not preclude the Government from taking private property for public use. Rather, the Constitution guarantees that the citizen will be fully compensated for such a taking. By requiring just compensation the Constitution makes the property owner whole, and it also places a constraint on government action by imposing the cost of such action on the Government's fisc, thus subjecting administrative action to the discipline of public decision-making and legislative authorization. In recent years the Supreme Court has extended the salutary protection of the Fifth Amendment to excessive governmental regulation—the 'regulatory taking' issue[6]—in addition to the traditional takings area in which the government actually acquires private property interests for its own use—the 'physical taking' issue.

In the case before us, the matter falls into the traditional acquisition area. Plaintiff alleges that the Government took its property—its government-granted patent right—when the Government's subcontractors used the patented method in the production of certain products employed in the F-22 production.[7] On its face, the claim seems straightforward. Property rights are created by law. In the ordinary course, the law is state law. In the case of patents, the law is federal, and the patent statute

---

[6]    See, e.g., <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003 (1992).

[7]    Section 1498 expressly makes the United States liable for the actions of its contractors and subcontractors:

> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a).

expressly declares that the rights in an issued patent are property. 35 U.S.C. § 261 ("[P]atents shall have the attributes of personal property."); see also Consol. Fruit-Jar Co. v. Wright, 94 U.S. 92, 96 (1876) ("A patent for an invention is as much property as a patent for land.").

One of the property attributes of a patent grant is the right to exclude all others, including the Government, from "making, using, offering for sale, or selling" the patented invention without the patentee's consent. 35 U.S.C. § 154(a)(1); see Carl Schenck, A.G. v. Nortron Corp., 713 F.2d 782, 786 n.3 (Fed. Cir. 1983) ("The patent right is but the right to exclude others, the very definition of 'property.'"). When a private party uses without authority an invention subject to patent rights, the wrongful use is the tort of infringement. The patentee's judicial remedy is a suit for infringement in accordance with Title 35, United States Code. See 35 U.S.C. §§ 271, 281. However, when the wrongful use is committed by the United States Government (or its agents), such suit is not brought under Title 35 but under Title 28, section 1498. (The judicial remedy provided by 28 U.S.C. § 1498 will be discussed in Part IV, below.)

Nevertheless, when the Government chooses to acquire a patent right without prior permission of the owner, there is a way, unrelated to infringement law and unique to the Government, through which a patentee's right to exclude others may be obtained. The Government can exercise its power of eminent domain and simply seize or, as we say, 'take' the property it needs for a public use. In effect, the Government forcibly acquires a license to use the invention. However, because of the Constitution, the Government may do this only if it pays the just compensation demanded by the Fifth Amendment. The trial court examined the question of whether there could be such a

taking independent of the terms of § 1498. The court concluded, correctly, that the answer is yes, and that the Court of Federal Claims has jurisdiction under the Tucker Act to entertain that claim. The Government's challenge to that conclusion is the first question certified to this court. See Zoltek Corp. v. United States, No. 96-166 C (Fed. Cl. Feb. 20, 2004) (order).

On appeal, the panel majority in its per curiam opinion disagrees with the trial court. The opinion relies on its understanding of the Schillinger case, in which, according to the per curiam opinion, "the Supreme Court rejected an argument that a patentee could sue the government for patent infringement as a Fifth Amendment taking under the Tucker Act," per curiam op. at 7, and, we are told, Schillinger remains good law. That statement is essentially the entire explanation offered for the opinion's slavish reliance on Schillinger.

The problem with the majority's statement of Schillinger is that it misconstrues the holding in Schillinger, and equates the taking claim with an infringement action, when as a matter of law these are two separate legal claims founded on separate legal bases. The tort of patent infringement is statutorily based and defined, and exists at the discretion of Congress; the right to just compensation for a taking is constitutional, it is not a tort, and it requires no legislative blessing. Furthermore, Schillinger, on which the majority bases its result, was not a taking case at all.

Schillinger filed a petition in the Court of Claims for damages for alleged unauthorized use of his patent by the Government. At the time (1894), it was understood that the jurisdiction of the Court of Claims for suits against the United States lay in contract, but not in tort. The Court of Claims held that since Schillinger's suit did

not involve a contract, either expressed or implied, on the part of the Government for the use of the patent, the petition was outside of the jurisdiction of that court. The Supreme Court agreed.

The Supreme Court said "[t]hat this action is one sounding in tort is clear." 155 U.S. at 169. The Court opined that the Court of Claims has no jurisdiction of claims against the Government for mere torts. "Some element of contractual liability must lie at the foundation of every action." Id. at 167. The Court restated "the frequent ruling of this court that cases sounding in tort are not cognizable in the court of claims." Id. at 169. Since the cause of action was for tort, and not contract, the Court affirmed the trial court's dismissal of the suit.

In dissent, Justice Harlan first asked the question, "Can a suit be maintained against the United States in the court of claims, as upon contract, for the reasonable value of such use of the patentee's improvement?" Id. at 173 (Harlan, J., dissenting). He argued that the constitutional provision for just compensation placed an implied *contractual* duty on the Government to pay for what it used, and that plaintiff could waive the tort and sue on the contract.

He further noted that "[t]here is another view of the case which is independent of mere contract." Id. at 179 (Harlan, J., dissenting). The newly enacted Tucker Act of 1887 for the first time gave the Court of Claims jurisdiction to hear and determine "all claims founded upon the constitution of the United States."[8] Justice Harlan observed that "[i]f the claim here made to be compensated for the use of a patented invention is not founded upon the constitution of the United States, it would be difficult to imagine

---

[8] Act of March 3, 1887, 24 Stat. 505.

one that would be of that character." Id. (Harlan, J., dissenting).  But the Court majority gave scant attention to this argument; it dismissed it with the back of its hand, stating summarily that such a broad reading could be applied to every other provision of the Constitution as well as to every law of Congress.

What is critical to appreciate is that when Schillinger was decided in 1894, the judicial treatment of the then-new Tucker Act provision cited by Justice Harlan was still in its early stages of development.  It was not until some years later, and the Supreme Court's decision in Jacobs v. United States, 290 U.S. 13 (1933), that the identity of a separate, non-statutory, constitutional basis for takings remedies under the Fifth Amendment emerged.  Along with that understanding came the understanding that the opening clause of the Tucker Act provides the Court of Claims (now the Court of Federal Claims) with a separate jurisdictional basis for such actions, separate from its other bases.

In Jacobs the Supreme Court left no doubt that a constitutional 'taking' claim was not simply another version of the typical Tucker Act suit against the Government.  The narrow issue before the Court was whether plaintiff, whose Fifth Amendment taking claim against the Government for flooding of its land had already been adjudicated in its favor, was entitled to interest on its award.  If the taking suit against the Government was limited to traditional statutory remedies, the answer was no, as no statutory provision for interest had been provided.  The Court of Appeals had so held.  The Supreme Court reversed, and awarded interest, stating that claims for just compensation are grounded in the Constitution itself:

> The suits were based on the right to recover just compensation for
> property taken by the United States for public use in the exercise of its

04-5100, -5102                                   11

power of eminent domain. That right was guaranteed by the Constitution. The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. *The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the amendment. The suits were thus founded upon the Constitution of the United States.*

Id. at 16 (emphasis added).

That has been the law at least since 1933. Today a cause of action under the Fifth Amendment's taking clause is understood to be neither a tort claim nor a contract claim, but a separate cause arising out of the self-executing language of the Fifth Amendment. As the Supreme Court recently explained in First English Evangelical Lutheran Church of Glendale v. County of Los Angeles:

[G]overnment action that works a taking of property rights necessarily implicates the "constitutional obligation to pay just compensation." We have recognized that a landowner is entitled to bring an action in inverse condemnation as a result of "'the self-executing character of the constitutional provision with respect to compensation.'" . . . Jacobs, moreover, does not stand alone, for the Court has frequently repeated the view that, *in the event of a taking, the compensation remedy is required by the Constitution.*

482 U.S. 304, 315-16 (1987) (citations omitted) (emphasis added).

Furthermore, there is no longer any question that the opening clause of the amended Tucker Act covering "all claims founded upon the constitution of the United States" provides the Court of Federal Claims with jurisdiction over such claims. How else could Fifth Amendment actions be brought today in the Court of Federal Claims for inverse condemnation, see, e.g., Hendler v. United States, 952 F.2d 1364 (Fed. Cir. 1991), or for regulatory takings, see, e.g., Fla. Rock Indus., Inc. v. United States, 18 F.3d 1560 (Fed. Cir. 1994)?

In the case of inverse condemnation takings, such as is the case here, the Government has not used its eminent domain power affirmatively, but is alleged by a plaintiff to have committed by Government action a taking of private property without the just compensation required by the Fifth Amendment. If these cases are considered to be based on tort, the Court of Federal Claims would be without jurisdiction as it remains well established that that court has no general tort jurisdiction. And, as in regulatory takings cases as well, there is no element of contractual or consensual understanding between the owner whose property is taken and the Government that takes it. If traditional contract-based jurisdiction were required under the Tucker Act, the Court of Federal Claims would be without jurisdiction because there is no contract. Nevertheless, for the reasons explained by the Supreme Court in First English, the Court of Federal Claims today under the Tucker Act hears and decides both inverse condemnation and regulatory takings cases, and we review them on appeal. Whatever relevance the argument in Schillinger may have had to constitutional takings back in 1894 regarding contract and tort jurisdiction in the Court of Claims, it has none now.[9]

In the case before us, in response to the trial court's instructions plaintiff amended its pleading to make clear that its Fifth Amendment takings claim was separate and distinct from the statutory infringement claim. It is established law that the Constitution creates its own remedy, and the Tucker Act expressly gives jurisdiction over such constitutional claims to the Court of Federal Claims. Plaintiff has alleged a

---

[9] Since Schillinger is not relevant to the question of whether plaintiff has a taking claim, the per curiam's discourse regarding whether Crozier v. Fried. Krupp Aktiengesellschaft, 224 U.S. 290 (1912), decided eighteen years after Schillinger, "effectively overruled Schillinger sub silentio," per curiam op. at 7, is equally irrelevant to the question of whether a separate cause of action exists for a constitutional taking of a patent right.

property interest in its patent, and a taking of that interest by the United States. As the trial court correctly concluded, plaintiff's non-frivolous allegation of a constitutional taking claim comes within the jurisdiction of the Court of Federal Claims and entitles plaintiff to a trial on the merits. Summary judgment in favor of the Government as the majority dictates is wrong as a matter of law, and is a denial of plaintiff's constitutional rights.

In response to this explanation of established law, the per curiam opinion simply repeats its confusion over statutory remedy and constitutional right. The answer to the takings issue, we are told, "is simple. Unlike regulatory takings and the inverse condemnation of real property, the 'taking' of a license to use a patent creates a cause of action under § 1498." Per curiam op. at 11. Consequently, since in the majority's view there is no remedy on these facts under § 1498, there is no constitutional right either. The notion that the constitutional right to just compensation is defined by the terms of a statute—§ 1498 in this case—is elaborated in Judge Gajarsa's concurring opinion, in which he opines that "it is the responsibility of Congress, and of Congress alone to decide whether, and to what extent, it will permit the courts to help it fulfill its Constitutional obligations under the Takings Clause." Gajarsa concurring op. at 26.

This is a remarkable view of the Constitution. Can it be that Congress, by a stroke of the legislative pen, may withhold the remedies and revoke the protections given to the citizenry by the Fifth Amendment, not to mention the other Articles of the Bill of Rights to the Constitution? Fortunately no authority exists for such a radical doctrine of legislative preemption over constitutional right. Wisely, Congress has never attempted to establish one, and in fact Congress in the Tucker Act expressly provides

for the courts' jurisdiction over these takings claims. To argue that Congress in enacting § 1498 successfully cabined the Constitution is the reverse of the understanding that the Constitution trumps legislation; it hardly seems appropriate for this court to be the first to announce such a contrary view of constitutional doctrine.

Judge Dyk in his concurring opinion concludes that, since under his view of the case the Government's conduct was non-infringing (i.e., § 1498(a) was not violated because § 271(a) was not), there was no wrong and thus no basis for a takings claim. Dyk concurring op. at 5. As a result, we do not know Judge Dyk's view of the takings issue directly, though by joining the per curiam opinion he presumably shares Judge Gajarsa's view of § 1498, whatever it is understood to be, as the sole remedy for a taking of a patent right.

In my view, the existence of a proper takings claim is an issue wholly independent of whether under § 1498 there is a valid claim that triggers a remedy under that statute. The latter is a question of statutory right granted by Congress under its legislative authority pursuant to the Constitution; the former is a matter of constitutional principle the vindication of which Congress has properly provided for by remedy in the Court of Federal Claims pursuant to the provisions of the Tucker Act. The mixing and merging of these two separate legal concepts in the manner the majority has done is incorrect as a matter of law, and leads them to an erroneous conclusion.

### IV. The Section 1498 Infringement issue

The second issue before us is whether plaintiff has stated a separate cause of action under 28 U.S.C. § 1498(a) for damages based on a claim of unauthorized use by

the Government. The answer is yes. The per curiam opinion's decision to the contrary is based on the proposition that there can be no Government liability under § 1498(a) unless the same conduct, if done by a private party, would constitute infringement under 35 U.S.C. § 271(a). However, that statement, blending the two disparate sections of the statutes into one, has no basis in the statutory language, nor is there binding precedent of this court in support of such a proposition.

In his concurring opinion, Judge Gajarsa acknowledges the problem with the incorporation theory, and therefore he presents an alternative argument that reaches the same result based on an interpretation of § 1498(c). For the reasons I shall explain, that interpretation of subsection (c) is not correct. Finally, I conclude this section with a comment about the constitutional concerns raised by the majority's interpretation of § 1498.

**1.**

The per curiam opinion concludes that, for the Government to be liable under § 1498(a) for the unauthorized use of a patented process, each claimed step must be performed *in the United States*. Nothing in § 1498(a) speaks about performance in the United States; that notion is come to only by incorporating into § 1498(a) the requirement for infringement by a private party under 35 U.S.C. § 271(a): "whoever without authority . . . uses . . . any patented invention, *within the United States* . . . , infringes the patent." (Emphasis added.) Contrast that with the actual language of § 1498(a): "Whenever a [patented] invention is used . . . by or for the United States . . . without lawful right . . . , the owner's remedy shall be by action against the United States." Section 1498(a) simply does not contain the same territorial limitation on

infringement as § 271(a). Congress obviously knew how to write limiting language when it wanted to; its absence means that there is nothing in subsection (a) of § 1498 that requires that the infringing activity, or any part of it, take place in the United States; that is the role played by subsection (c), discussed below.

I do agree with one premise relied on by the majority—that under either § 1498(a) or § 271(a) the use of a method claim in order to infringe requires that each and every step of the claimed process be performed. There is no basis, however, for reading into § 1498(a) the requirement that each step be performed *in the United States*.

28 U.S.C. § 1498(a) makes no reference to 35 U.S.C. § 271(a), nor does anything in § 1498 suggest any link between actions brought under Title 28 and those brought under the authority of Title 35. Indeed, though there may be similarities between the two, our cases make it clear that the statutes in Title 35 dealing with infringement litigation between private parties have no direct application to infringement litigation against the United States under 28 U.S.C. § 1498. See Motorola, Inc. v. United States, 729 F.2d 765, 768 (Fed. Cir. 1984) ("Although a section 1498 action may be similar to a Title 35 action, it is nonetheless only parallel and not identical."); see also Leesona Corp. v. United States, 599 F.2d 958, 968-69 (Ct. Cl. 1979).

The per curiam opinion, rather than interpreting the relevant statutes, relies on what Judge Gajarsa refers to in his concurring opinion as the "NTP proposition," to the effect that infringement under § 271(a) is necessary for government liability under § 1498. See NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1316 (Fed. Cir. 2005). Judge Gajarsa points out that the evolution of this broad statement began with

04-5100, -5102                                    17

our predecessor court's holding in <u>Decca Ltd. v. United States</u>, 640 F.2d 1156 (Ct. Cl. 1980).  <u>Decca</u> involved a suit against the Government under § 1498, and stated that under that section the Government can be liable only for direct infringement and not inducement of infringement or contributory infringement.  <u>Id.</u> at 1167.  Judge Gajarsa correctly describes how this court mischaracterized that holding in a footnote in <u>Motorola</u>.  <u>See</u> <u>Motorola</u>, 729 F.2d at 768 n.3.  In that case, a Claims Court decision had purported to incorporate 35 U.S.C. § 287—the patent marking statute—into § 1498 as an additional government defense.  The Federal Circuit reversed, holding that incorporation was incorrect.  The <u>Motorola</u> footnote, intended to support the no-incorporation principle by illustrating the various situations in which § 1498 differs from Title 35, at the end of the lengthy footnote managed to confuse the two in a somewhat incoherent sentence, a sentence that is at best mere dictum.

Where I part company with Judge Gajarsa is in the next evolutionary step, in which he concludes that the relationship between § 271(a) and § 1498(a) suddenly became binding precedent of this court in <u>NTP</u>.  The parties in <u>NTP</u> were NTP, a U.S. corporation, the patent owner, and Research in Motion, a Canadian corporation, the accused infringer.  The suit was under Title 35.  The United States was not a party to the suit, and 28 U.S.C. § 1498 was not at issue.

In <u>NTP</u>, the accused system consisted of many components, one of which was a relay component located in Canada.  In determining whether the accused infringer used the system "within the United States," as required for infringement under § 271(a), this

court looked for guidance to <u>Decca Ltd. v. United States</u>, 544 F.2d 1070 (Ct. Cl. 1976), the facts of which were not unlike those of <u>NTP</u>.[10]

In <u>Decca</u>, the accused infringer was the Government, and the suit was under § 1498. The question was whether § 1498(c)—the subsection exempting claims arising in a foreign country—precluded Government liability when some parts of the Omega positioning system were used worldwide. The Court of Claims determined that the Government was nevertheless liable for the alleged infringing use because control and beneficial use of the system were not foreign-based. <u>Decca</u>, 544 F.2d at 1083. <u>NTP</u> simply applied the same reasoning to conclude that the presence of RIM's relay component in Canada did not preclude a jury from finding that use of the accused system took place in the United States, as required under § 271(a).

It is not surprising that the <u>NTP</u> panel found the <u>Decca</u> decision "instructive" because of the similarity in fact patterns. The result in <u>NTP</u> could have been justified without any formal 'linking' of the <u>Decca</u> statute and the <u>NTP</u> statute. The precise 'linking' statement in <u>NTP</u> is: "Although <u>Decca</u> was decided within the context of section 1498, which raises questions of use *by* the United States, the question of use *within* the United States also was implicated because direct infringement under section 271(a) is a necessary predicate for government liability under section 1498." <u>NTP</u>, 418 F.3d at 1316 (citing <u>Motorola</u>, 729 F.2d at 768 n.3). Since government liability under § 1498 was not at issue in <u>NTP</u>, the statement is not in any sense necessary to the holding in <u>NTP</u>, and it is at best a passing comment about a statute not before the court. The

---

[10] Note that there are two <u>Decca</u> decisions, one in 1976 addressing the liability phase of the case, 544 F.2d 1070, and one in 1980 addressing the damages phase, 640 F.2d 1156.

04-5100, -5102                                    19

discussion that precedes and follows the comment makes clear that the NTP court understood this. There exists no binding precedent of this court mandating that § 271(a) be incorporated into § 1498(a).

Judge Dyk in his concurring opinion argues for making the dictum in NTP controlling law. He supports his *ipse dixit* by piecing together bits of language from legislative history found in the Congressional Record, language from cases on different matters, and broad conclusions about what Congress could not have meant by what it did not say. His position has no basis in the statutory language and, as Judge Gajarsa cogently points out, ignores the role of § 1498(c), which is the only provision addressing the § 1498 extraterritoriality issue. If § 1498(a) incorporates a "within the United States" territoriality requirement, so that the Government is liable only when its infringing act occurs in the United States, what is the purpose of § 1498(c), the 1960 amendment to § 1498 that exempted Government liability for claims arising in a foreign country? If the Government's infringing act must take place in the United States in order for the Government to be liable under § 1498(a), then exempting Government actions that arise in a foreign country under § 1498(c) is unnecessary. It is a court's obligation to make every part of a statute have meaning. The position advocated by Judge Dyk renders § 1498(c) meaningless.

**2.**

Because § 1498(a), properly understood, does not incorporate the "within the United States" requirement of § 271(a), I agree with Judge Gajarsa's alternative view that we must look to § 1498(c) to determine how and when the Government's liability under § 1498(a) is subject to geographical constraints. Section 1498(c) reads in its

entirety: "The provisions of this section shall not apply to any claim arising in a foreign country."  At the outset it is well to remember that the word "claim" in § 1498(c) means the same as 'claim' in a pleading, i.e., a 'cause of action.'  Thus we are looking for the earmarks of a cause of action, and where it arises.

As noted above, I agree with Judge Gajarsa's answer to the first question he poses in Part II of his concurring opinion: a patented method is used within the meaning of § 1498(a) only if all steps of the claimed process are performed.  Gajarsa concurring op. at 10-13.  That proposition seems clear enough, and correct.  It follows that in order for a cause of action to arise under § 1498(a) for use of a method patent all steps of the method must have been practiced by the alleged infringer.

The next question then is how does subsection (c) of § 1498 relate to patent infringement under subsection (a), i.e., when and how does a cause of action for patent infringement against the United States arise in a foreign country?  The language of subsection (c) does not answer the question, nor is there anything in its legislative history that is particularly helpful.  To resolve the issue before us we need not answer the question in its broad terms—the issue before us is a narrow one.  When the use of a method patent is alleged, and we have concluded that all of the steps of the method must be performed in order for an infringement of the patent to have occurred, what are the requirements, with particular regard to territorial location, for the performance of these steps?  Where must the steps be performed in order for the cause of action to arise "in a foreign country"?

Looking across the range of choices, there are three.  The first and easiest case is when each and all of the steps are completed within the United States.  Here there is

no foreign entanglement whatsoever, so subsection (c) has no application and the Government is subject to the requirements of § 1498(a). That case is not before us, but it is useful to have it in mind as we pursue the remainder of the analysis. The second and next easiest case is when each and all of the steps are completed in a foreign country. If the prohibition in subsection (c) is to have meaning in the context of using a method patent, it must apply here. In the case before us, the Nicalon silicon carbide fibers were manufactured into sheets in Japan, the record indicating that all of the steps of the patented invention were performed there. Even though those sheets were imported into the United States and used in the Government's fighter aircraft, summary judgment for the Government under § 1498 would be appropriate because this would constitute a "claim arising in a foreign country," and subsection (c) affords the Government a complete defense.

The interpretive problem becomes more difficult in the third case, in which some of the steps of the method patent are practiced abroad, and some in the United States. That is the situation with the silicide fiber mats made from Tyranno fibers, since the Tyranno fibers are manufactured in Japan and then processed into mats in the United States, allegedly requiring use of one or more of the steps of the patented method in both places. In dealing with this fact pattern, Judge Gajarsa in his concurring opinion tells us that each, i.e., all, of the steps must be performed within the United States in order for a cause of action to avoid the arising-in-a-foreign-country exception. Put another way, if *any one step* occurs outside the United States, it is a cause of action that arises in a foreign country, and thus is barred by § 1498(c).

That cannot be the law. A cause of action does not 'arise' in a place just because any one step of a multi-step process patent occurs there. Beyond that, Judge Gajarsa's position cannot be reconciled with the proposition that all steps must be completed before a compensable use, i.e., infringement of a method patent, occurs under § 1498(a).

I understand my colleague's dilemma—there is no guidance in the statute, in the legislative history, or in prior cases as to what to make of this provision when the steps of a method patent have been performed both in and out of the country. But that is no reason to abandon logical analysis in preference for a policy-rooted and result-driven conclusion. The logic of the statute and what seems to me to be the basic policy underlying § 1498 is that when the Government has allegedly benefited from infringing conduct by its contractors or subcontractors, and when fairness decrees that the Government be held responsible for its wrongs—the fundamental principle underlying § 1498(a)—then the fact that one or another step of a process occurred outside the United States should not alone immunize the Government from liability.

This case involves patent claims utilizing numerous steps in the manufacture of a specialized high-technology material of unique interest to the Government. There is no basis in law or policy for absolving the Government from liability, now and forever, for the wrongful conduct of its agents just because any one step of a multi-step patented method can be found to have occurred outside the United States—that is an invitation to strategic conduct if ever there was one. I conclude that the Government is liable under § 1498(a) for an unauthorized use of a method patent unless *all* steps of the method are

practiced abroad, thus causing the claim to be one "arising in a foreign country." See § 1498(c).

**3.**

Finally, because the per curiam opinion and at least one of the concurring opinions devotes so much time to the cases construing § 1498, I cannot, even in the interest of brevity, ignore the offered analyses. The forerunner of § 1498, enacted in 1910, was a straightforward piece of legislation. The 1910 statute was entitled "An Act to Provide Additional Protection for Owners of Patents of the United States, and for Other Purposes," and provided that "whenever an invention described in and covered by a patent of the United States shall hereafter be used by the United States without license of the owner thereof or lawful right to use the same, such owner may recover reasonable compensation for such use by suit in the court of claims."[11] A straightforward reading of the statute would be that this is a waiver by Congress of the Government's sovereign immunity from the tort of patent infringement, and authority to sue the Government for the tort in the Court of Claims.

That, however, was not the way the Supreme Court initially viewed the statute when it came before the Court two years later in the case of Crozier v. Fried. Krupp Aktiengesellschaft, 224 U.S. 290 (1912). Plaintiff Fried. Krupp, the patentee, sought a permanent injunction against Wm. Crozier, the Chief of Ordnance of the United States Army, for unauthorized use of its patented invention regarding guns and gun carriages. The Government demurred on the grounds that the Court of Claims lacked jurisdiction over the suit.

---

[11] Act of June 25, 1910, ch. 423, 36 Stat. 851.

The Supreme Court, after reviewing the history of infringement suits against the Government up to and including Schillinger, turned to the new statute:

> In substance, therefore, in this case, in view of the public nature of the subjects with which the patents in question are concerned and the undoubted authority of the United States as to such subjects to exert the power of eminent domain, the statute, looking at the substance of things, provides for the appropriation of a license to use the inventions, the appropriation thus made being sanctioned by the means of compensation for which the statute provides.

224 U.S. at 305.

Working through the prolix language, it seems that the Court chose not to read the new statute as a simple authorization for suits for the tort of patent infringement against the Government, but instead read the statute as an illustration of the Government's obligations under the Fifth Amendment. Why the Court thought the statute was the one and not the other is not explained. Perhaps it was the long-standing rule, which the Court had only recently reiterated in Schillinger, that the Court of Claims did not have jurisdiction over torts. Perhaps it was discomfort with the permanent injunction being sought against the Army's efforts to modernize its guns—after all Fried. Krupp was a German corporation and the drums of war, though still distant, were beating. Perhaps it was a bow to Justice Harlan's dissent in Schillinger arguing for using the Fifth Amendment to allow a recovery, though if the statute authorized a tort action, a power Congress clearly has,[12] there would be no need for a constitutional justification. Whatever the explanation, the Court in Crozier was clear: "[W]e think there is no room for doubt that the statute makes full and adequate provision

---

[12]    See Federal Tort Claims Act, 28 U.S.C. § 1346(b).

for the exercise of the power of eminent domain for which, considered in its final analysis, it was the purpose of the statute to provide." Id. at 307.

Does it matter which of these underlying theories—tort or constitution—supports a plaintiff's suit under § 1498? In some cases, it would not seem to matter. However, despite the fact that in light of modern cases our adherence to the Crozier theory has been called "at best anachronistic and at worst misleading,"[13] in other cases the underlying theory has had an effect on the outcome; such cases continue to recite the taking theory. See, e.g., Hughes Aircraft Co. v. United States, 86 F.3d 1566, 1571 (Fed. Cir. 1996) ("The government's unlicensed use of a patented invention is properly viewed as a taking of property under the Fifth Amendment through the government's exercise of its power of eminent domain and the patent holder's remedy for such use is prescribed by 28 U.S.C. § 1498(a)."); Leesona, 599 F.2d at 964 ("When the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the fifth amendment.").

If either the majority's incorporation theory or Judge Gajarsa's alternative theory prevails, it will certainly matter. To the extent § 1498 is understood to incorporate into its provisions the entitlements provided by the Fifth Amendment's 'taking' clause, any statutory limitation providing less than just compensation would be unconstitutional. Reading § 1498 to provide that any one step in a method, no matter how strategically

---

[13] Thomas F. Cotter, Do Federal Uses of Intellectual Property Implicate the Fifth Amendment?, 50 Fla. L. Rev. 529, 555 (1998) ("[T]he habit, in which both the Federal Circuit and the Court of Federal Claims continue to indulge, of invoking the takings mantra when discussing section 1498 claims is at best anachronistic and at worst misleading.").

planned, will insulate the Government from its own wrongdoing is hardly consonant with the purposes of the Fifth Amendment.

Judge Gajarsa responds to my concerns about the takings issue, and his merger of the constitutional requirement for just compensation with § 1498, by arguing that there is no constitutional requirement for a *judicial* remedy for a taking. See Gajarsa concurring op. at 25-27 & nn.13-14. He points out that Congress could choose to provide the remedy directly by legislation. Perhaps; at least so long as the constitutionally required remedy is provided, that may be true.[14] But Congress, since the creation of the Court of Claims, prefers not to spend its time writing special bills; instead, it has provided a judicial remedy for takings claims through the Tucker Act and that remedy meets the requirements of the Constitution. If the judicial remedy is limited to the provisions of § 1498, as my colleagues argue, then that section must also meet the requirements of the Constitution. The argument that Congress could satisfy the

---

[14] Lynch v. United States, 292 U.S. 571 (1934), from which Judge Gajarsa seeks support (and which in turn relied for support on the now-overtaken Schillinger opinion), stands on a quite different footing than an inverse condemnation case. Lynch was an insurance contract case, in which the plaintiff's decedent, by choosing to contract with the Government presumably for his own benefit, had chosen to place his rights in the hands of a sovereign who asserts that it can determine contractual rights as it wants. Whether viewed as a contract remedy or, as Lynch tried to do, as some sort of a taking, the plaintiff's decedent had for good or ill put himself at risk of the Government's claim that it is free to change its policy. In Lynch, the case turned on whether Congress, in revoking the insurance program, had withdrawn its consent to be sued under existing contracts—the Court held it had not. 292 U.S. at 583. Whether the Fifth Amendment is available as a remedy in cases involving mutual rights under Government contracts is not at issue here. The issue here is whether the Fifth Amendment protects the individual from the unilateral acts of the sovereign, when inverse condemnation is called for, and it makes no constitutional sense to say that persons who did not choose in the first instance to deal with the Government are nevertheless at the mercy of the Government's willingness to pay.

Constitution by doing it all itself on an individual basis is academically interesting, but hardly relevant.

*******************************************

In sum, plaintiff alleges *inter alia* that the Government has infringed its United States patent under the terms of United States patent law; on appeal, the issue is whether plaintiff has stated a cause of action under § 1498 for which relief could be granted. I would hold plaintiff has done that, at least with regard to the silicide fiber mats made from Tyranno fibers, and would remand the matter to the trial court for further proceedings on this issue, as well as on the constitutional taking claim.